SCOTT PUBLISHING CO., Inc.,
Plaintiff,

v.

COLUMBIA BASIN PUBLISHERS, INC.;
Howard Parish and Associates, Inc.;
Howard W. Parish; James M. Bryce;
Kennewick-Pasco Typographical Union
No. 831; Unitypo, Inc.; International
Typographical Union; Woodruff Randolph; Don Hurd; Walter D. Marvick;
Charles M. Lyon; Harold H. Clark; Joe
Bailey; Francis E. McGlothlin; A. L.
Wilie; Seattle Typographical Union No.
202; and Allied Printing Trades Council of Seattle, Defendants.

No. 4030.

United States District Court
W. D. Washington, N. D.

Dec. 4, 1959.

Carl A. Jonson, Johnson, Jonson & Inslee, Seattle, Wash., Howard M. Downs and Robert D. Raven, Morrison, Foerster, Holloway, Shuman & Clark, San Francisco, Cal., for plaintiff.

Joseph A. Barto, Lundin, Barto & Goucher, Seattle, Wash., for defendants Columbia Basin Publishers, Inc., Howard Parish and Associates, Inc., Howard W. Parish and James N. Bryce.

Alfred J. Schweppe, Marion A. Marquis and Fredric C. Tausend, McMicken, Rupp & Schweppe, Seattle, Wash., for remaining defendants.

Sidney Dickstein, Dickstein, Shapiro & Galligan, New York City, for defendants International Typographical Union and Unitypo, Inc.

MURRAY, District Judge.

This cause came on regularly for trial before the Honorable W. D. Murray, United States District Judge for the District of Montana, sitting by designation in the Western District of Washington, Northern Division, without a jury, commencing on the 8th day of September, 1959. Appearances: Mr. Carl A. Jonson, of Messrs. Johnson, Jonson & Inslee, Attorneys at Law, Seattle, Washington, and Mr. Howard M. Downs and Mr. Robert D. Raven, of Messrs. Morrison, Foerster, Holloway, Shuman & Clark, Attorneys at Law, San Fran-cisco, California, appeared for the plaintiff; Mr. Joseph A. Barto of Messrs. Lundin, Barto and Goucher, Attorneys at Law, Seattle, Washington, appeared for the defendants Columbia Basin Publishers, Inc., Howard Parish and Associates, Inc., Howard W. Parish and James M. Bryce; Mr. Alfred J. Schweppe, Mr. Marion A. Marquis and Mr. Fredric C. Tausend, of Messrs. McMicken, Rupp & Schweppe, Attorneys at Law, Seattle, Washington, appeared for the remaining defendants, and Mr. Sidney Dickstein, of Messrs. Dickstein, Shapiro & Galligan, Attorneys at Law, New York City, New York, also appeared for the defendants International Typographical Union and Unitypo, Inc.

The action was commenced in 1955. Defendants, in addition to those presently remaining in the case, were brought in and subsequently dismissed. Extensive pre-trial discovery procedures were undertaken by both sides. The trial commenced before the Court, sitting without a jury, on September 8, 1959, and consumed two months. A record of over 7,300 typewritten pages was compiled and over 500 exhibits were marked in evidence. During the trial much of the evidence was received over objection on reserved rulings, and several questions of law were presented. However, in considering the case after all the evidence was in and after able arguments by counsel for all parties, the Court has concluded that the case involves essentially a determination of the factual issues presented, and when that determination has been made, as it has, the law questions pass out of the case. In making the determination the Court has considered all of the evidence, including that which was received on reserved rulings.

Plaintiff brought this action under Sections 15 and 26, Title 15, U.S. C.A., charging defendants with combining and conspiring together for the purpose of destroying and driving out of business the Tri-City Herald, a daily newspaper published by plaintiff in the Tri-City area of the State of Washing-

ton, in order to create a monopoly for the Columbia Basin News in the daily newspaper business in that area, in violation of the anti-trust laws, and specifically Sections 1, 2, 13, 14 of Title 15, U.S.C.A.

Scott Publishing Company, the plaintiff herein, is a corporation organized under the laws of the State of Washington, on September 17, 1947, and since November, 1947, has been and still is engaged in the business of publishing The Tri-City Herald, a daily evening newspaper at Kennewick, Washington, and distributing such newspaper throughout the Tri-City area, as that area will be hereinafter more specifically referred to and described.

In the publication of The Tri-City Herald, Scott Publishing Company is engaged in interstate commerce. Newsprint is purchased from sources outside the State of Washington, national and international news is gathered and disseminated; national as well as local advertising is sold and published, and the Herald is distributed by mail and other means outside of the State of Washington.

The principal founders, officers and stockholders of Scott Publishing Company are Robert F. Philip, who has been president of the corporation since its formation, and Glenn C. Lee, who has been Secretary-Treasurer since the inception of the corporation. Glenn C. Lee has been publisher of the Tri-City Herald and Philip has assisted in its management. Lee and Philip, though experienced businessmen in other fields, had no experience in the newspaper publishing business prior to their entering that field in the Tri-City area.

The Tri-City area consists of the cities of Kennewick and Richland in Benton County, Washington, and the City of Pasco in Franklin County, Washington, and the area surrounding those three cities. Formerly Pasco and Kennewick were small farming communities on the Columbia River, and Richland was nonexistent, but with the end of World War II and the advent of atomic energy, the Hanford Atomic Works was constructed and Richland was established on government land with government owned houses and buildings to house the workers at the Atomic Energy plant. In the fall of 1947, McNary Dam was constructed on the Columbia River at a point some 14 miles from Kennewick and additional dams were planned for the development of the Columbia Basin. Public power was available in the area and irrigation projects were established, all of which led to a substantial growth of the area in population and economic activity. By 1947, there was a population of around 50,000 in the Tri-City area, and its future economic potential seemed very great.

In 1947, Lee and Philip, who were then in the import-export business, became aware of the Tri-City area and its potential for future development and learned that the Pasco Herald, a weekly newspaper, job printing shop and office supply business in Pasco, Washington, was for sale. At about the same time Lee and Philip became acquainted with one Hugh Scott, a man who had had some newspaper experience, and the three decided to form Scott Publishing Company, the plaintiff herein, and purchase the Pasco Herald, which they did, agreeing to pay the former owner a total of $80,-000, plus the inventory. Scott Publishing Company took possession of the property on October 1, 1947. Scott ceased to be an officer and director of Scott Publishing Company in 1949.

Scott Publishing Company operated the job shop and office supply business and continued to publish the Pasco Herald as a weekly paper until November 13, 1947. The operation was a profitable one. The potential growth factors of the Tri-City area were such that Scott, Lee and Philip decided that a daily newspaper would be successful in the area, and within a matter of weeks after Scott Publishing Company took possession of the Pasco Herald, publication of a daily newspaper was planned, and on November 13, 1947, the first issue of a daily paper was published. Initially the paper

was published 5 days a week, but in January, 1949, a Sunday issue was added, and ever since, the paper has been published six days a week, excluding Saturday. The name of the paper was charged from the Pasco Herald to the Tri-City Herald when daily publication commenced.

The conversion of the weekly Pasco Herald to the daily Tri-City Herald was almost an immediate success, but it raised serious problems for Scott Publishing Company. The expanded operation required more personnel of all kinds, the opening of additional offices in Kennewick and Richland, additional newsprint, which at the time was difficult to obtain. The plant and press were inadequate to handle the publication of a daily newspaper. Skilled mechanical workmen necessary for the expanded operation were not available locally and had to be recruited from all over the Pacific Northwest and even further afield. Distribution of the weekly Herald had been by mail from the single Pasco office and the conversion to a daily required the establishment of carrier organizations and offices in the three cities. And ever present was the need for sufficient capital to carry on the expanded operation.

Scott Publishing Company with great difficulty met and solved the problems. Personnel were recruited and trained, additional offices were opened, and in 1948, in the late summer, a larger press was obtained, together with a building in Kennewick to house it, and at that time the Tri-City Herald moved from Pasco to Kennewick. However, the newsprint problem and the problem with respect to sufficient working capital remained.

The defendant Howard W. Parish is a man who spent most of his life in the newspaper business, a substantial part of it in and around the Pacific Northwest. He has had experience in all phases of the newspaper business, but predominately in circulation and management. He formerly was publisher of the Seattle Star, a daily newspaper published in Seattle, Washington, until 1946, when it ceased publication. When the Seattle Star went out of business, Parish acquired a stock interest in The Craftsman Press, Inc., a large commercial printing establishment in Seattle and held the office of Secretary-Treasurer of that company.

Parish traveled throughout the State of Washington on business of The Craftsman Press, Inc., and became acquainted with the Tri-City area as a result of such travels. He acquired additional information concerning the Tri-City area by reading a report prepared by one Earl McCallum, an expert in the newspaper field with reference to the newspaper business in the Tri-City area. Furthermore, at some time prior to February, 1949, Scott Publishing Company had prepared a brochure advertising the Tri-City area and the Tri-City Herald which was to be used to attract national advertising. Because Scott Publishing Company was not equipped to print in color, and as the brochure was to be prepared in color, Scott Publishing Company had the printing done by The Craftsman Press, Inc., in Seattle, and Parish became familiar with the data contained in that brochure and likewise met Lee and Philip in connection with their newsprint problem and also in connection with the printing of the brochure in February, 1949. Parish also had acquired considerable information concerning the background of Lee and Philip and the Scott Publishing Company and the difficulties which they were encountering in the publication of the Tri-City Herald and particularly the financial problems with which they were faced.

As a result of all this information Parish became interested in getting into the newspaper business in the Tri-City area. He acquired the financial backing of several substantial business men in Seattle and in April or May of 1949, he telephoned Philip and asked if Scott Publishing Company was interested in selling the Tri-City Herald. Philip informed him that they might be interested in selling if a price could be agreed upon. At that time the Scott Publish-

ing Company was very much in need of additional working capital and Philip and Lee arranged a meeting with Parish at which they hoped to interest Parish in the purchase of stock in the Scott Publishing Company, or possibly sell him the Tri-City Herald.

At the meeting Parish informed Lee and Philip that he was not interested in purchasing a minority interest, but stated he was interested in purchasing the controlling interest or the entire property. Lee and Philip set the price at $410,000 for the entire company which Parish considered too high and he offered $250,000 and no agreement was reached.

As stated before, Parish was aware of the tremendous possibilities of the Tri-City area. He was also familiar with the background of Lee and Philip, their inexperience in the newspaper business in contrast to his own wide experience in that business. He was likewise familiar with the constant financial problems which Scott Publishing Company was continuously struggling with, whereas he felt that he, through his associates, had ample financial backing, and because of all of these factors which seemed to weigh so heavily in his favor and against Philip and Lee, he believed there was a golden opportunity for him in the newspaper business in the Tri-City area. At the meeting with Lee and Philip, when the purchase of the Tri-City Herald was discussed, Parish pointed out these things to Philip and Lee and stated that he would start a newspaper in the Tri-City area to compete with them and that they would end up by having to sell their newspaper to Parish at 5¢ on the dollar.

Thereafter, in August, 1949, the defendant Columbia Basin Publishers, Inc., was incorporated. The original incorporaters were Parish, the defendant James M. Bryce, who is Parish's son-in-law, and John X. Johnson, one of the Seattle business men associated with Parish, and who subsequently furnished the principal financial support of the Columbia Basin Publishers, Inc., in its early days, together with several other Seattle business men.

The Columbia Basin Publishers, Inc., commenced publication of the Pasco News, a weekly newspaper at Pasco in August, 1949. The circulation of the Pasco News was on a free distribution basis. The publication of the Pasco News on a weekly basis continued until November, 1949, when publication was stepped up to bi-weekly, and at that time acquisition of the facilities to publish a daily newspaper was commenced. As a weekly newspaper the Pasco News competed with the Tri-City Herald for advertising within the Tri-City area and particularly in Pasco. However, at no time before Columbia Basin Publishers, Inc., commenced publication of the daily Columbia Basin News, under the circumstances hereinafter set forth, had the Pasco News, either as a weekly or a bi-weekly, earned a profit.

Prior to August, 1949, members of the Typographical Union in the Tri-City area had been under the jurisdiction of the local Typographical Union at Walla Walla, Washington, which is some 50 miles away from the Tri-City area. Because of this distance, members of the Typographical Union in the Tri-City area desired to form their own local and in August, 1949, the defendant Kennewick-Pasco Local 831 was chartered and affiliated with the International Typographical Union. At some time prior there had been a contract between the Typographical Union through the Walla Walla local with the predecessor of the Scott Publishing Company, but before Scott Publishing Company took over, that contract had expired and there was no contract concerning terms of employment between the Typographical Union and Scott Publishing Company.

After the formation and chartering of Local 831, and on December 2, 1949, Local 831 mailed notices to employers in the Tri-City area asking the commencement of collective bargaining negotiations. The employers notified were Scott Publishing Company, Columbia Basin Publishers, Inc., Husk Printing Company

and Meverden Printing Company, the latter two being commercial job printing shops. Lee, on behalf of the Scott Publishing Company, because of his personal feeling toward Parish, declined to join with the other employers in the area in meeting with the negotiating committee of Local 831. Nevertheless the other three employers in the area, after several meetings with the Scale Committee of Local 831, one of which was attended by one Art Schmidt, President of the Seattle Local of the International Typographical Union, and a Mr. Hudson of the Tacoma Local of the I.T.U., signed a contract fixing the scale for members of the I.T.U. at $90.00 a week for 38¾ hours work.

Originally the Union's demand was for $95.00 a week for 37½ hours work, which was the Seattle scale at that time, but this demand was compromised for the $90.00 figure and the 38¾ hours.

Thereafter Local 831 commenced negotiations with Scott Publishing Company. Not getting anywhere with the negotiations the Local Union requested assistance from the I.T.U. and special representatives of the President of the I.T.U., Whiting and Marvick, came into the area and participated in the negotiations. When the representatives of the I.T.U. appeared in the negotiations, Scott Publishing Company appealed to Pacific Northwest Newspaper Publishers Association for assistance in the negotiations and one D. S. Haines, Secretary of that Association joined in the negotiations on behalf of Scott Publishing Company.

The union people took the position that the only thing they could accept from Scott Publishing Company was the same contract which they had secured from the other employers in the area. Scott Publishing Company felt it could not pay the scale of $90.00 a week for 38¾ hours of work and likewise felt that certain provisions of the contract which had been signed by the other employers were illegal and therefore that it could not execute such a contract. At that time the wages paid by the Scott Publishing Company were $80.00 a week for 40 hours work. While the raise to $90.00 a week, which the Union demanded, was somewhat higher than was then being paid in other comparable communities in the State of Washington, and the northwest, it was not an unreasonable demand for the Union to make upon Scott Publishing Company, particularly in view of the fact that the other employers in the area had agreed to such a wage. After having secured such a contract from the other employers, the Union could not in fairness to them have accepted anything less from Scott Publishing Company. There is no evidence that the other three employers did not enter such contract in good faith. As has been pointed out, Scott Publishing Company was given the opportunity to join with the other three employers in their negotiations with the Union, but had declined to do so, nor was there anything unreasonable in the Union's insistence upon a written contract with Scott Publishing Company, particularly in view of the fact that two employees of Scott Publishing Company, who had been active in the organization of Local 831, were discharged without apparent reason.

It likewise appears that in refusing to accept such contract Scott Publishing Company was acting in good faith. At the time of the negotiations the Tri-City area was in a depressed economic situation and it did not appear to Scott Publishing Company that it could afford to give the demanded increase without becoming bankrupt. Furthermore, Scott Publishing Company was advised by Mr. Haines that certain provisions of the contract demanded were illegal and subsequent litigation, many years later, concerning like provisions in other contracts, indicate at least that Mr. Haines was not unreasonable in his belief. At any rate the Court finds that both the Union representatives and the Scott Publishing Company negotiated in good faith on both sides but were unable to reach an agreement.

When the negotiations broke down on March 3, 1950, a strike or lockout ensued.

Whether the rupture of relations between the Scott Publishing Company and its employees is a strike or a lockout is not clear. The Local Union had taken a strike vote and had applied to the I.T.U. for strike sanction and had received the same. However, no date for a strike had been set and members of the Union on shift at the Scott Publishing Company, on the evening of March 3, 1950, on returning to work after lunch, found strangers performing their jobs. However, whether it was a strike or a lockout is immaterial in this case, because it is evident that whatever form it took there would have been a severance of relations between the employer and employees when they failed to reach an agreement.

Before the strike or lockout occurred, it had become apparent to Scott Publishing Company that no agreement could be reached with the Local Union, and Scott Publishing Company, with the assistance of Mr. Haines of the Publishers Association, arranged to recruit non-union employees to produce the Tri-City Herald under strike conditions. Likewise teletypesetter equipment was furnished by the Publishers Association which permitted production of the paper with fewer skilled employees. When the strike or lockout occurred, publication of the Tri-City Herald continued by these means.

The fact that it was almost certain there would be a strike or lockout involving the Tri-City Herald was common knowledge in the Tri-City area before it occurred. Parish, Bryce and their associates in the Columbia Basin Publishers, Inc., were likewise aware of the strong possibility of labor trouble for Scott Publishing Company and the Tri-City Herald. As has been pointed out, Parish and Bryce and Columbia Basin Publishers, Inc., moved into the Tri-City area with the intention of eventually publishing a daily newspaper in competition with the Tri-City Herald and as early as the preceding November, had acquired sufficient plant facilities and personnel for that purpose. Therefore, when it became apparent that a strike or lockout

was imminent at the Tri-City Herald, all that remained to be done by Columbia Basin Publishers, Inc., in order to start publication of a daily newspaper, was to complete arrangements that had already been started for features, comics and so forth for a daily newspaper. These arrangements were completed and on March 14, 1950, 11 days after the strike or lockout at the Tri-City Herald commenced, Columbia Basin Publishers, Inc., commenced publication of the Columbia Basin News as a morning daily newspaper 5 days a week, and this was subsequently increased to 6 days.

Almost immediately after the strike or lockout started at the Tri-City Herald, Local 831 commenced strike activities against the Tri-City Herald. Picket lines were established, attempts were made to induce both readers and advertisers of the Tri-City Herald to cease doing business with that paper, "Do Not Patronize" lists of merchants advertising in the Tri-City Herald were distributed, radio broadcasts were made; other unions in the area were induced to discourage their memberships from patronizing the Tri-City Herald—in short all the traditional means of exerting pressure against an employer involved in a labor dispute with organized labor was engaged in.

With the appearance of the Columbia Basin News as a daily newspaper, a bitter competitive struggle commenced between the News and the Herald, and between the respective publishers, Columbia Basin Publishers, Inc., represented by Parish and Bryce, and Scott Publishing Company, represented by Lee and Philip. The News, being in the position of the newcomer and seeking to gain a foothold in the field against a thoroughly established paper (at that time circulation of the Herald was in excess of 12,-000, and it had substantial amounts of local and national advertising) was required to undertake very expensive programs to build circulation. Circulation is the lifeblood of a newspaper because it is circulation that attracts advertising and it is from advertising that the prin-

cipal revenue of a newspaper is derived. Special reduced subscription rates were offered, free distribution of the News over wide areas was accomplished, contests were run, delivery routes beyond the trading area of the Tri-City area were established, all in an effort to build circulation, and all of which was very costly, but very necessary and normal in the establishment of a new newpaper in an area occupied by an established paper.

The publishers of the News were likewise happy to take every advantage possible of the situation existing between Local 831 and the Tri-City Herald. The Union on the one hand was interested in exerting economic pressure against Scott Publishing Company by causing a loss of business and revenue in any and every way it could in order to force Scott Publishing Company to meet its demands for what it deemed a fair labor agreement, and Columbia Basin Publishers, Inc., was interested in gaining all the business of Scott Publishing Company it could in order to establish its newspaper, and the two cooperated, not with the common objective of eliminating Scott Publishing Company from the field, but each with its own separate purpose.

In the field of advertising Columbia Basin Publishers, Inc., at the beginning of the daily publication of the Columbia Basin News, established a rate card which proved to be unrealistic, and rates actually paid by advertisers during the year following commencement of the daily publication were generally below the rate indicated on the rate card. Because of the News' low circulation in the beginning, relative to the circulation of the Tri-City Herald, it could not expect to charge and receive the same rates that the Herald received with its wider circulation. Again in the field of advertising the publishers of the Columbia Basin News were only too happy to take any advantage they could of the efforts of Local 831 to induce advertisers not to do business with the Tri-City Herald.

It is these circumstances outlined above upon which plaintiff relies to es-

tablish a conspiracy on the part of Parish, Bryce and the Columbia Basin Publishers, Inc., to drive Scott Publishing Company and the Tri-City Herald out of the newspaper business in the Tri-City area and to establish a monopoly for the Columbia Basin Publishers, Inc. There is no direct evidence of such a conspiracy and, of course, direct evidence is not needed. However, all of the evidence in the case up to this point, it seems to the Court, is at least as consistent with a reasonable, good-faith attempt on the part of Parish to establish a competing newspaper in the Tri-City area as it is with the idea of a conspiracy to drive the Tri-City Herald out of business.

Parish saw and was attracted to the Tri-City area by the same rosy picture of the future of the area that attracted Lee and Philip. He likewise saw Lee and Philip as inexperienced novices in the newspaper business, unfinanced and over-expanded. He considered himself an expert in the business and believed he had sufficient financial backing to establish a competing newspaper. The evidence shows that the establishment of a newspaper against a monopoly newspaper in a given area is an expensive proposition under any circumstances. Parish realized this and believed he could establish such a paper at a cost of $500,000. To hold that the fact of one entering a business under these circumstances is evidence of a conspiracy to violate the anti-trust laws is to thwart the very purpose of those laws and turn them into instruments for the protection of monopolies. Of course, it must have occurred to Parish that in the event he were successful in establishing his newspaper in the area, the result might be that the Scott Publishing Company would be forced out of business, but that is a normal, natural, everyday occurrence when inexperienced, unfinanced people are forced to meet experienced, adequately financed competition. Parish's statements to Lee and Philip, at the time he attempted to buy the Tri-City Herald, rather than indicating a purpose to violate the anti-trust laws and create a

monopoly for himself were rather simply a prediction of what Parish believed would be the result of Lee and Philip attempting to compete with him in the newspaper business.

Plaintiff also relies on the circumstances of the Columbia Basin Publishers, Inc., contracting with the Local to pay higher wages at a time when it was losing money, the strike or lockout against the Tri-City Herald, Columbia Basin Publishers, Inc., going daily at that time, again when it was losing money, and the cooperation between Local 831 and Columbia Basin Publishers, Inc., as being evidence of the conspiracy charged against Parish, Bryce and Columbia Basin Publishers, Inc., and of the Local joining in that conspiracy. While all of these circumstances would be consistent with plaintiff's theory of conspiracy if it were proved, they are likewise just as consistent with proper, legal, independent purposes and intentions on the part of Parish, Bryce and Columbia Basin Publishers, Inc., on the one hand and Local 831 on the other.

There is no evidence that Parish or Bryce had anything to do with fixing the demands which Local 831 presented to publishers in the Tri-City area. Indeed, the evidence is that none of the Scale Committee or Officers of Local 831 were acquainted with Parish or Bryce at the time the demands were formulated. The demand for $95 for a 37½ hour week was fixed by the entire Union membership, and it was based upon the wages and hours then prevailing in Seattle. There is uncontradicted testimony, which the Court accepts, that normally and customarily in negotiations between typographical locals and employers in smaller communities the scale prevailing in metropolitan areas is interjected and discussed and bargained for by the local unions in the smaller communities, and is in some instances achieved. So, there was nothing unreasonable in the demands of Local 831.

Nor was there anything unreasonable or sinister in Columbia Basin Publishers, Inc., coming to terms with the Union. In the first place, the demand presented for $95 for a 37½ hour week was not met, but there was a compromise of $90 for 38¾ hours, so to that extent negotiations did take place. Perhaps, if Scott Publishing Company had chosen to join with the other employers in the area, including Columbia Basin Publishers, Inc., in negotiations with the Union, as it was invited to do, the presentation of such a united front by the employers would have resulted in further reducing the demands of the Union. Secondly, in view of Columbia Basin Publishers, Inc., and Parish's determination to get a daily newspaper started in the area, and their acceptance of the fact that they were bound to spend some considerable money in the process in any event, they no doubt considered it prudent in a business sense to come to terms with the Union in view of the highly unionized character of the area as shown by the evidence, and also in view of Parish's experience that newspapers usually fared badly in disputes with Unions.

The evidence shows that Parish used the strike or lockout at the Tri-City Herald as his signal to go into the daily publication of the Columbia Basin News. Again while this would be consistent with the purpose on the part of Parish to drive the Tri-City Herald out of business and to establish a monopoly in violation of the anti-trust laws, it is equally consistent with the purpose of starting a newspaper with the bona fide intention of competing. Parish, Bryce and Columbia Basin Publishers, Inc., were in the area for the avowed purpose of starting a daily newspaper in competition with the Tri-City Herald. Though they were still losing money in their by-weekly publication, when they saw their competitor with a strike or lockout on his hands, it was the most natural thing in the world to choose that time to go daily, and it is also completely consistent with a bona fide attempt to establish a competing business enterprise.

As for the cooperation which was established between Local 831 and Columbia Basin Publishers, Inc., Parish and

Bryce, that too was a perfectly natural result of the circumstances which existed at the time. Local 831 and its members understandably were delighted to have a fair newspaper started to compete with what they considered to be the unfair newspaper. Not only did it furnish employment for Local 831 members, but it furnished also an additional lever to be used in the Union's attempt to pry an agreement from the Tri-City Herald. The publishers of Columbia Basin News likewise welcomed any assistance they could obtain from Local 831 in their attempt to build circulation and advertising and to establish a daily newspaper. There was indeed cooperation between the two, but each acting for its own legal independent purpose.

After commencement of publication of the daily Columbia Basin News in March, 1950, and despite the assistance of labor unions in the area in furtherance of the strike or lockout against the Tri-City Herald, the losses of Columbia Basin Publishers, Inc., continued and increased. To some extent the losses were those normally to be expected in an attempt to establish a daily newspaper against existing competition. Not only was Columbia Basin News in competition circulation-wise with the Tri-City Herald, but because it was a morning daily newspaper, it encountered competition from metropolitan morning daily newspapers which were circulated in substantial numbers in the area, and this competition from the metropolitan papers was in part responsible for Columbia Basin News' high circulation costs. It likewise appears from the record that the losses to some extent were the result of haphazard management. Parish, the experienced newspaper man, continued to reside in Seattle and continued his employment with The Craftsman Press, attempting to manage the Columbia Basin News from a distance. Later, in August of 1950, when an attorney for I.T.U. and Unitypo came to the area in connection with a loan, he reported that the minute book of Columbia Basin Publishers, Inc., was in proper form for the first few months, but had not thereafter been kept up, that Parish had no financial statement which he could submit; that no inventory of the physical properties had ever been made; that the books were in a most confused state; that it appeared that little or nothing had been entered since June of that year and that Parish had then in August put a new auditor in charge to try to bring some order out of the chaos existing.

Parish and his associates discovered that the Tri-City area was not the soft touch competition-wise that they had anticipated. Furthermore, the substantial financial backing which Parish had anticipated from his Seattle businessmen associates failed to materialize. The record shows that after their original investment, which was soon expended, that one John X. Johnson, a businessman of Seattle, was the only associate who contributed financial support to the Columbia Basin News, and his contributions were relatively small, two or three thousand dollars at a time in order to meet payrolls and other expenses, and even Johnson, prior to his death in July, 1950 was becoming reluctant to invest any more money in the venture.

By May of 1950, Parish inserted an ad in "Editor & Publisher", a trade journal, in an attempt to sell the Columbia Basin News, but without success. Later that summer, Bryce contacted Glenn Lee of Scott Publishing Company in an endeavor to interest him in purchasing the Columbia Basin News, again without success, although Lee went so far as to make an appraisal of the Columbia Basin News' plant. There was a subsequent meeting between Lee and Bryce, arranged by Dudley Brown, a Seattle newspaper man, at which Bryce attempted to sell the Columbia Basin News to Lee, but that attempt likewise resulted in failure when Bryce insisted that a condition of the sale would be that the contract between Columbia Basin Publishers, Inc., and the Local Union be honored.

These attempts to sell out are again not consistent with a purpose or intent to drive the Tri-City Herald out of busi-

ness for the purpose of establishing a monopoly in the area.

The defendant International Typographical Union is a labor organization with its principal office at Indianapolis, Indiana, and having approximately 110,000 members in some 800 local unions throughout the United States and Canada, and as such is engaged in representing its members through local unions in their relationship with their employers. As part of its activities, it aids members engaged in a strike or lockout by granting funds to such members by way of special assistance and strike benefits. Funds are obtained through dues and assessments levied by the membership upon themselves.

The governing body of the I.T.U. is the Executive Council, consisting of the President, the first Vice-President, the second Vice-President, the third Vice-President and the Secretary-Treasurer. Such officers are elected by the membership every two years.

The defendants Woodruff Randolph, Don Hurd, Harold H. Clark, Charles M. Lyon and Joe Bailey were all members of the Executive Council during at least a part of the time here involved. The defendant Walter D. Marvick is a special representative of the President of the International Typographical Union in the State of Washington.

Faced frequently with the situation where its members became involved in a strike or lockout with the publisher of the only newspaper in a given area, the I.T.U. adopted the policy of either establishing a paper of its own to compete with the monopoly publisher, or rendering financial assistance where needed to a publisher whom the I.T.U. considered friendly to establish or maintain a competing newspaper. In furtherance of this policy in 1946, the I.T.U. formed the defendant Unitypo, Inc., as a corporation under the laws of the State of New York. The members of the Board of Directors of Unitypo, Inc., are the members of the Executive Council of the I.T.U., except for one, because of the requirements of the New York law that at least one di-

rector of a new York corporation be a resident of New York. The stock of Unitypo, Inc., is held by the members of the Executive Council of the I.T.U. in trust for the membership, again with the exception of the qualifying share held by the New York director. Funds for the operation of Unitypo, Inc., are supplied by I.T.U. from its so-called defense fund which in turn is raised by assessments on the members of I.T.U.

Since its inception, Unitypo, Inc., has started newspapers in various cities in the United States and Canada, where members of the I.T.U. became engaged in a strike or lockout with a monopoly publisher. It has likewise rendered encouragement and financial assistance to publishers considered friendly and who were competing with the publisher with whom I.T.U. was engaged in a strike or lockout. Where Unitypo, Inc., establishes a newspaper, it has been its policy to sell it to an independent publisher whenever the opportunity presents itself, and not to continue in the publishing business.

The defendant Howard Parish, from his experience in the newspaper business, was aware of the I.T.U. policy and Unitypo, Inc., and when the losses of the Columbia Basin News continued to mount and as financing became increasingly difficult to obtain, Parish obtained authority from the stockholders of Columbia Basin Publishers, Inc., to seek a loan of $25,000 from Unitypo, Inc. The resolution authorizing Parish on behalf of the Columbia Basin Publishers, Inc., to apply to Unitypo, Inc., for a loan was passed on June 15, 1950, but nothing was done to carry out the resolution until after the death of John X. Johnson in July, 1950.

In August, 1950, Parish called Unitypo, Inc., at Indianapolis, Indiana, by telephone requesting financial assistance. Upon receipt of the request one Clarence R. Martin, an attorney for Unitypo, Inc., and I.T.U., was sent into the State of Washington to investigate the situation. When Martin arrived in Seattle in August the financial situation of Colum-

bia Basin News was critical. Martin arranged for an immediate $10,000 loan in the following manner through the Seattle First National Bank: the bank agreed to lend the $10,000 upon receipt of a note and chattel mortgage upon the Columbia Basin News' plant, which was immediately endorsed by the bank and assigned to Unitypo, Inc., which then reimbursed the bank. The assignment to Unitypo, Inc., of the note and chattel mortgage was not recorded. The reason for this roundabout way of getting the money from Unitypo, Inc., to Columbia Basin Publishers, Inc., and the secrecy which surrounded all transactions between Unitypo, Inc., and Columbia Basin Publishers, Inc., was the prior experience of Unitypo, Inc., and I.T.U. around the country of having the newspaper they sought to aid encounter advertisers' resistence when it became known that the Union was supporting the paper.

The losses continued and the $10,000 was soon expended and it became necessary to seek another loan from Unitypo, Inc. At that time Unitypo, Inc., sent a man out to the Tri-City area to appraise the plant and equipment of Columbia Basin News and Unitypo, Inc., agreed to purchase the plant and equipment for $25,000, which included the prior $10,000 loan, and lease it back to Columbia Basin Publishers, Inc., with an option to repurchase. This transaction was consummated on October 2, 1950. By November, 1950, Columbia Basin Publishers, Inc., was again in need of money and sought an additional loan from Unitypo, Inc. On November 30, 1950, Unitypo, Inc., made an additional $25,000 loan, and took as security a pledge of all of the stock of Columbia Basin Publishers, Inc. Losses continued and Unitypo, Inc., again in February, 1951, made an additional loan secured by the stock of Columbia Basin Publishers, Inc., and thereafter continued to make unsecured loans to Columbia Basin Publishers, Inc., and by 1954, the indebtedness of Columbia Basin Publishers, Inc., to Unitypo, Inc., had reached almost one-half million dollars. At that time Uni-

typo, Inc., made demand for payment of the loans made in 1950 and 1951, for which the stock of Columbia Basin Publishers, Inc., had been pledged as security, or in the alternative that the stock be issued to Unitypo, Inc. This latter was done, but Unitypo, Inc., almost immediately transferred the stock to Parish and Bryce, who in turn redeposited the stock with Unitypo, Inc., endorced in blank as security for the then outstanding loans. The stock still stands in the name of Parish and Bryce on the records of the corporation.

Still the losses continued and by December 31, 1958, the indebtedness of Columbia Basin Publishers, Inc., to Unitypo, Inc., had reached $1,178,000. In addition, in 1952, Unitypo, Inc., caused to be organized the defendant Howard Parish and Associates, Inc., as a Washington corporation and provided the financing to this corporation to enable it to purchase and remodel a building which was thereafter leased and used as a plant and office by Columbia Basin Publishers, Inc. All of the stock of Howard Parish and Associates, Inc., except for qualifying shares, was held by Unitypo, Inc.

The overall management of Columbia Basin News was conducted through the years by Howard Parish until December 31, 1958. At that time the I.T.U. replaced Parish as manager of Columbia Basin News with Edward Byrne, who had formerly been publisher of I.T.U. and Unitypo, Inc., papers at Colorado Springs, Colorado, and Jamestown, New York. At the same time James Bryce and Charles Parker, who had been one of the original incorporators, resigned as directors and officers of Columbia Basin Publishers, Inc., and were succeeded by Byrne as Vice-President and director, and Frank Cummings as Secretary-Treasurer and director. Frank Cummings is also Secretary-Treasurer of Local 831 of I.T.U. Parish still remains as a director, but has nothing to do with the management and Columbia Basin News has in effect become an I.T.U. operated paper. Funds for the operation

of the News are supplied by the I.T.U. in the form of special strike assistance to Local 831, which in turn delivers the funds to the Columbia Basin News. Since I.T.U. has taken over the management of the Columbia Basin News the amount of the losses has decreased, but nevertheless the newspaper continues to operate at a loss. From January 1, 1959, up to the date of trial, the deficits in the operation of the Columbia Basin News, which have been made up by the I.T.U. through special assistance to Local 831, total $40,000.00.

In the years after Unitypo, Inc., commenced financing Columbia Basin News, Parish and Bryce wrote many letters and reports to the Board of Directors of Unitypo, Inc., and the Executive Council of the I.T.U., reporting on the progress of Columbia Basin News and containing references to "driving Lee and the Scott Publishing Company to the wall", "forcing a merger", "beating Lee", and so on. Plaintiff regards these letters and reports as showing an intent and purpose on the part of Parish and Bryce to drive the Tri-City Herald out of business in order to create a monopoly for the Columbia Basin News, and as a communication of such intent to the I.T.U. and Unitypo, Inc. While again such communications would be consistent with such a purpose, if the purpose was otherwise shown to exist, they appear to the Court to be merely communications on the part of Parish and Bryce in the nature of a sales pitch to their financial angel in an effort to keep the money coming, and were no doubt received in that spirit by the I.T.U. and Unitypo, Inc. Because of the policy of I.T.U. above referred to, and the purposes for which Unitypo, Inc., was created, it is unlikely that such sales pitches were required in order to retain the financial support of the Columbia Basin News by Unitypo, Inc. The record shows that in other areas throughout the United States and Canada I.T.U. and Unitypo, Inc., have expended considerable sums for the purpose of keeping a competing newspaper in operation.

A further indication of the lack of the intent and purpose on the part of Parish, Bryce and Columbia Basin News on the one hand and Unitypo, Inc., and I.T.U. on the other to destroy the Tri-City Herald so as to create a monopoly for Columbia Basin News, lies in the method in which the money was expended. While the $1,178,000 that has been spent by Unitypo, Inc., in support of the Columbia Basin News up to January 1, 1959, is a considerable amount of money, it was expended over a period of almost nine years in amounts sufficient to meet the operating deficits as they occurred. It would seem that if there was a purpose and intent to drive the Tri-City Herald out of the business and such a large amount of money was available for that purpose, success would be much more likely to be achieved by spending the money in a relatively short time to cut subscription rates and circulation rates to such a point that the Tri-City Herald would have been unable to compete.

Another indication of the absence of such intent, particularly on the part of I.T.U. and Unitypo, Inc., lies in the fact that when Clarence Martin, the I.T.U. attorney, initially came to the area to investigate the situation, he reported to the I.T.U. and Unitypo, Inc., "Parish does not believe he has Lee worn down enough yet to buy him out at a reasonable price, but is encouraged by Lee's having asked Bryce for a conference. (Lee probably wants to buy out the Columbia Basin News, but apparently neither Lee nor Parish can get money enough together to buy out the other)." Despite the tremendous financial resources of I.T.U. and Unitypo, Inc., no offer was ever made to furnish Parish or Columbia Basin News or anyone else with sufficient funds to buy out the Tri-City Herald, nor was a request for such ever made by Parish, Bryce or Columbia Basin News. Had the purpose and intent to create a monopoly in the area existed, it could have been realized by the purchase of the Tri-City Herald at a considerably lower figure than has been expended to date.

Likewise significant as to the intent and purpose of Unitypo, Inc., and I.T.U. was the question which was put to the Board of Directors and Executive Council each time they were requested to vote upon another loan for Columbia Basin News, which was in effect "shall we advance additional money to continue publication of the Columbia Basin News?"

The record also shows that periodically through the years, notices were sent by the Local Union of the I.T.U. to the Tri-City Herald offering to resume negotiations. Again such offers are not consistent with an intent to drive the Tri-City Herald out of business, because at any time Scott Publishing Company could have entered a contract with the Local Union and any damage being done to it competitive-wise, by virtue of the strike or lockout, would have come to an end.

In view of all these circumstances, the Court finds that the intent and purpose of Unitypo, Inc., and I.T.U., in first assisting financially the Columbia Basin News and later taking over its publication, was simply to keep in operation in the Tri-City area a newspaper to compete with the Tri-City Herald, and was not to drive the Tri-City Herald out of business for the purpose of establishing a monopoly. The Court further finds that the purpose and intent of Parish, Bryce and Columbia Basin Publishers, Inc., at all times was to establish a newspaper in competition with the Tri-City Herald, and that accepting whatever financial assistance Unitypo, Inc., or I.T.U. were willing to furnish is not inconsistent with that intent and purpose.

When Columbia Basin News commenced daily publication after the strike or lockout against Tri-City Herald began, a very bitter competitive struggle developed between the News and the Herald. As has been mentioned, the management of Columbia Basin News was very inept to say the least, whether because Parish, with all his experience in the newspaper business regarded Lee and Philip, the guiding lights of Scott Publishing Company, as unworthy competitors or otherwise, does not appear. In any event advertising rates were set and a rate card published which proved to be totally unrealistic considered in the light of the circulation of the Columbia Basin News. As a result it was found necessary to sell advertising at rates that were generally below those on the published rate card. Such rates, while lower than those advertised on the rate card, were not unreasonably low as compared to the advertising rates of Tri-City Herald when the circulation of the two newspapers was considered. Despite the fact that the rates initially established proved to be unrealistic, it was not until March 1, 1951, that the management of Columbia Basin News revised its rate cards and established rates more in accordance with reality. Thereafter the rates charged advertisers did not substantially deviate from the rates published on the rate card. Newspaper advertising rates are based on the amount of advertising done by the advertiser, the more advertising inches used, the lower is the rate per inch. After the establishment of the March 1, 1951, rate card, the only sales of advertising to advertisers at a rate lower than the minimum rate shown on the rate card were to advertisers using more space than the maximum shown on the rate card and the reduction was relatively the same based on inches used as shown on the rate card.

In January, 1952, Columbia Basin Publishers, Inc., commenced the publication of a weekly free distribution newspaper known as the Columbia Basin News Shopper. The Shopper contained little else other than advertising, but did have some editorial content. By the Shopper, Columbia Basin News attempted to provide blanket coverage of the area, that is they endeavored to see that every home in the Tri-Cities received either the News or The Shopper, and combination advertising in the News and the Shopper was sold upon that basis. The publication of such a free distribution advertising edition is not uncommon in the newspaper business.

C. C. Anderson Company, one of a national chain of stores, was the largest single advertiser in the area. Because of personal differences between the then manager of the C. C. Anderson store and Glenn Lee, the publisher of the Tri-City Herald, so long as there was another daily newspaper in the area, the manager of C. C. Anderson would not have placed any advertising in the Tri-City Herald and would have advertised in any event in the Columbia Basin News exclusively. Because the C. C. Anderson advertising was placed generally on Fridays and resulted in an unbalanced daily page production for the Columbia Basin News, Columbia Basin Publishers, Inc., agreed to give C. C. Anderson five years of free advertising in the Shopper in consideration of Anderson's advertising in the Columbia Basin News being spread over five days, and in consideration of the fact that C. C. Anderson was the largest single advertiser in the Columbia Basin News.

In any event the Court finds that none of the rates charged any advertiser by Columbia Basin News were unreasonably low as compared to the rates charged advertisers by the Tri-City Herald when considered in the light of the relative circulation of the two newspapers.

Another practice engaged in by Columbia Basin News, with respect to national cooperative advertising is complained of by plaintiff. In cooperative advertising, a national advertiser, either a manufacturer or distributor of a given product, will cooperate with a local retailer in local advertising. An advertisement will be inserted in a local newspaper advertising the product and the manufacturer or distributor will reimburse the local retailer who inserts the ad for a portion of the cost of the ad. In cooperative advertising Columbia Basin News would issue double bills, one bill to the local retail merchant at his contract rate, based on the number of inches of advertising that he used in the Columbia Basin News, and this was the bill which the local retail advertiser would actually pay to Columbia Basin News. Columbia Basin News issued a second bill to the local merchant to be submitted to the national advertiser for reimbursement at the open rate which in most instances would be higher than the local merchant's contract rate. In this way the local merchant would receive reimbursement for a higher proportion of the bill for the given ad than the national advertiser had agreed to pay.

However, as has been pointed out, there was a bitter competitive struggle between the Columbia Basin News and the Tri-City Herald. Almost all of the devices, including the cooperative advertising practice, the publication of the Columbia Basin News Shopper, the giving of more favorable rates to larger advertisers, and the free distribution of newspapers, used by Columbia Basin News in this competitive struggle and of which plaintiff complains, were at one time or another throughout the period here in question used by the Tri-City Herald in this competitive struggle. In addition, Tri-City Herald used devices such as rebates to advertisers and payments of commissions to local advertising agencies on local display advertising to attract advertising, which were not used by Columbia Basin News. Plaintiff concedes that it engaged in some of the same practices as Columbia Basin News, but contends it has not done so to the same extent. The record bears this out, but it must be remembered that Columbia Basin News was in the position of the challenger seeking to become established in the field as against Tri-City Herald, already thoroughly established. Mention is made of the practices engaged in by the Tri-City Herald in the struggle, not because these practices would constitute a defense to Columbia Basin News' practices if they constituted a violation of the law, but merely to point up the fact that there was a bitter competitive struggle going on and that whatever was done by either party in that struggle was done for the purpose of competing and not pursuant to a conspiracy to monopolize.

Immediately after the strike or lockout commenced at Tri-City Herald and Columbia Basin News went daily, the Tri-City Herald lost both advertising and circulation revenue. When the strike started, Tri-City Herald's costs increased by virtue of the high wages and overtime paid to the non-union labor imported to keep the paper in publication when the regular employees ceased their employment. However, as employees were trained and as the equipment which they had brought in was utilized, their costs returned to normal and below what they had been before the strike commenced. By September, 1950, cuts, which personnel who had remained on the job had voluntarily taken because of the financial problem created by the strike or lockout, were restored; and raises were granted officers the following year and the financial condition of the Tri-City Herald and Scott Publishing Company has continued to improve. Their growth has not been as rapid as it otherwise would have been, but any slowing of its growth has been due to the strike or lockout and also due to the competition afforded by Columbia Basin News and not to any conspiracy on the part of these defendants or any of them to drive the Tri-City Herald and Scott Publishing Company out of business and monopolize the newspaper publishing business in the Tri-City area. At any rate, the Tri-City Herald at all times material has been and continues to be the dominant newspaper in the Tri-City area.

No advertising was sold in the Columbia Basin News or the Columbia Basin News Shopper, and no rates for advertising in either or both were fixed, upon any understanding or agreement that the advertiser would not advertise in the Tri-City Herald or any other advertising media in the area.

The advertising and subscription rates of Columbia Basin News were not established at a level where they would tend to operate as a means or method to achieve a monopoly by excluding the Tri-City Herald from the newspaper publishing business in the Tri-City area and there was no intent on the part of the defendants, either individually or in combination to so exclude the Tri-City Herald from the Newspaper publishing business in the Tri-City area.

Section 1 of the Sherman Act (15 U.S.C.A. § 1) provides:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, * * * is declared to be illegal; * * *."

Section 2 of the Sherman Act (15 U.S.C.A. § 2) provides:

"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states, or with foreign nations, shall be deemed guilty of a misdemeanor. * * *."

Before there is a violation of these sections, there must be a contract, combination or conspiracy in restraint of trade, or a monopoly, or an attempt to monopolize or a combination or conspiracy to monopolize. If an actual restraint of trade results from a combination, or if monopoly is achieved by an individual acting alone or in combination with others, the intent is immaterial, or may be inferred. United States v. Patten, 226 U.S. 525, 33 S.Ct. 141, 57 L.Ed. 333; United States v. Masonite Corp., 316 U.S. 265, 275, 62 S.Ct. 1070, 86 L.Ed. 1461; United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236; United States v. Columbia Steel Co., 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533. However, where no restraint of trade or monopoly results from the acts and conduct complained of, then the acts or conduct complained of must be accompanied by a specific intent to restrain trade or monopolize before there is a violation of Sections 1 or 2. Swift & Co. v. United States, 196 U.S. 375, 396, 25 S.Ct. 276, 49 L.Ed. 518; United States v. Columbia Steel Co., supra, 334 U.S. at page 525, 68 S.Ct. at page 1123.

In this case, the evidence does not show either an actual restraint of trade or monopoly, or the specific intent on the part of any of the defendants, either individually or in combination, to restrain trade or create a monopoly in the daily newspaper business in the Tri-City area.

Plaintiff also alleges violations of Section 2(a) of the Robinson-Patman Act (15 U.S.C.A. § 13(a)), and Section 3 of the Clayton Act (15 U.S.C.A. § 14), by defendants in the sale of advertising.

Section 2(a) of the Robinson-Patman Act prohibits discrimination in price between different purchasers of commodities of like grade and quality where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them.

Section 3 of the Clayton Act makes it unlawful for any person engaged in commerce to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, for use, consumption or resale within the United States or any place within the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares or merchandise, machinery, supplies or other commodities of a competitor of the lessor or seller, where the effect of such lease, sale, or contract for sale may be to substantially lessen competition or tend to create a monopoly.

While there is considerable doubt in the Court's mind whether newspaper advertising is a "commodity" within the meaning of the Robinson-Patman Act, or "goods, wares, merchandise, * * * or other commodities" within the meaning of the Clayton Act, decision of that question is unnecessary in this case in view of the Court's finding that there were no price discriminations by Columbia Basin News in the sale of advertising which had the effect of lessening competition or tended to create a monopoly or injure, destroy or prevent competition; and that there were no sales of advertising, or prices fixed for advertising, upon any agreement or understanding that the purchaser would not advertise in the Tri-City Herald.

It is the conclusion of the Court that plaintiff shall recover nothing in this action and that judgment shall be entered in favor of defendants for their costs. This opinion constitutes the Court's findings of fact and conclusions of law in this case, and counsel for defendants are directed to prepare, serve on counsel for plaintiff, and lodge with the Clerk a form of judgment in accordance with this opinion, within 15 days from date of receipt of a copy of this opinion, and counsel for plaintiff is granted 15 days after service upon it of such form of judgment within which to lodge with the Clerk in writing any objections which it may have to the form of such judgment.