UNION LEADER CORPORATION,
Appellant,

v.

NEWSPAPERS OF NEW ENGLAND
INC., et al., Appellees.

HAVERHILL GAZETTE COMPANY,
Appellant,

v.

UNION LEADER CORPORATION,
Appellee.

Nos. 5619, 5620.

United States Court of Appeals
First Circuit.

Heard Sept. 22, 1960.

Decided Dec. 2, 1960.

See also 186 F.Supp. 450.

Arthur Howard Bloomberg, Boston, Mass., with whom Phister & Judge, Boston, Mass., was on brief, for Union Leader Corp.

Robert H. Goldman, Lowell, Mass., with whom Frank Goldman, Lowell, Mass., Joseph F. Bacigalupo, Lawrence, Mass., and John J. Ryan, Jr., Haverhill, Mass., were on brief, for Haverhill Gazette Co. and others.

John F. Groden, Charles C. Worth, and Withington, Cross, Park & McCann, Boston, Mass., on brief submitted by Philip S. Weld and Essex County Newspapers, Inc.

Before GOODRICH, HARTIGAN and ALDRICH, Circuit Judges.

ALDRICH, Circuit Judge.

In this private antitrust action the plaintiff, Union Leader Corporation, alleged violations of sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1 and 2, by defendants Newspapers of New England, Inc. (NNE), NNE's component members and The Haverhill Gazette Company, and violations of section 7 of the Clayton Act, 15 U.S.C.A. § 18, by NNE. (In the course of the opinion we shall refer simply to section 1, section 2, or section 7.) In a counterclaim the Gazette alleged violations of sections 1 and 2 by Union Leader. Except for its claim against the Gazette the plaintiff was unsuccessful in all respects. It appeals, as does Gazette. Both here and below the parties, not surprisingly, have had their difficulties in taking courses which avoid both Scylla and Charybdis.[1] Although we have reviewed all claimed errors, we will say at the outset that we find no reason to pause over any attack, consistent or inconsistent, upon the court's findings or rulings except in so far as they concern three areas of conduct—certain joint activity of Union Leader and the printers' union; actions by Gazette claimed by it to be purely defensive; and the formation of NNE and its purchase of the Gazette.

In November 1957 the Gazette published the only daily newspaper in Haverhill, Massachusetts. Similarly, in Manchester, New Hampshire, some 28 miles from Haverhill, the single daily newspaper was published by the Union Leader, operated by one Loeb. On November 20, 1957, a strike was called by the Gazette's printers. The paper was out of publication for three days, when operation was resumed with nonunion printers. The district court found that there was strong union sentiment in the city of Haverhill, and that during the strike circulation and advertising fell off by fifty per cent. On November 30, 1957, six Haverhill merchants (subsequently increased to eight, and hereinafter referred to as the merchants), visited Loeb in Manchester to urge him to publish a Haverhill shopper[2] in which they could place Christmas advertising without giving offense to the union. Loeb acceded. Publication of the Haverhill Journal followed on December 5 and December 12. Encouraged by the favorable reception, Loeb announced in the second issue that he would publish as a regular daily, and commenced doing so on December 16. Active competition between the Journal and the Gazette has occurred ever since in what was described by the court as a "life-and-death struggle."

■■ The court found that by nature of circumstances Haverhill is a one-paper

---

1. The orders to the helmsman were clear enough. "The Court should avoid creating by implication inharmony between different parts of the same opinion which are capable of reconciliation." (Union Leader's brief in No. 5620.)

2. A shopper, also known as a throwaway, is a newspaper containing principally advertising which is distributed free, and without request, at doorways.

area. Prior to the events leading to this case both the Gazette and the Union Leader enjoyed what might be termed "natural" monopolies, as cities of the size in which they operate cannot support two good daily newspapers under present-day conditions.[3] The court found that each paper came by its monopoly position in a lawful fashion, and correctly ruled that neither had "monopolized" in violation of section 2. A monopolist does not violate the act if the monopoly is "thrust upon it." United States v. Aluminum Co. of America, 2 Cir., 1945, 148 F.2d 416, 429. "A market may, for example, be so limited that it is impossible to produce at all and meet the cost of production except by a plant large enough to supply the whole demand." Id. at page 430. See United States v. E. I. du Pont de Nemours & Co., 1956, 351 U. S. 377, 391–393, 76 S.Ct. 994, 100 L.Ed. 1264. No change, of course, was effected by Union Leader's publication of the Journal. It was a foregone conclusion that if successful the Journal would eventually drive the Gazette out of business, and, naturally, Union Leader proposed to succeed. But intending the natural consequences of acts which are in all respects lawful, does not constitute the "exclusionary intent" that is a prerequi-

site for finding a violation of section 2. In other words, a natural monopoly market does not of itself impose restrictions on one who actively, but fairly, competes for it, any more than it does on one who passively acquires it.[4] In either event, there must be some affirmative showing of conduct from which a wrongful intent can be inferred. See United States v. Griffith, 1948, 334 U.S. 100, 105–108, 68 S.Ct. 941, 92 L.Ed. 1236; United States v. United Shoe Machinery Corp., D.C.D. Mass.1953, 110 F.Supp. 295, 297, 341, affirmed 347 U.S. 521, 74 S.Ct. 699, 98 L. Ed. 910.[5] The court found that such an affirmative showing had been made with respect to both Union Leader and Gazette.

Commencing chronologically, it was admitted that Loeb hired some of the Gazette's striking printers to distribute the shopper. The court found that this was done to inform the public that the shopper had the union's support. More serious is its finding that union representatives accompanied the shopper's advertising solicitors and "asked merchants not to advertise in the Gazette, and simultaneously advertising solicitors of ULC asked these merchants to advertise in the Journal." [180 F.Supp. 133] [6] Union

---

3. In Massachusetts, Boston and Lynn are the only cities with more than one paper (excluding morning and evening by the same publisher). This phenomenon, of course, is not restricted to Massachusetts. See Times-Picayune Publishing Co. v. United States, 1953, 345 U.S. 594, 602–603 and note 13, 73 S.Ct. 872, 97 L.Ed. 1277.

4. An interesting speculation might be whether the antitrust laws were intended to protect one natural monopolist against another, in view of the fact that there was no competition before the battle began and there would be none afterwards. Both parties flirt with this thought when the purpose serves. Since these laws are concerned primarily with the public interest, Associated Press v. United States, 1945, 326 U.S. 1, 17, note 16, 65 S.Ct. 1416, 89 L.Ed. 2013, rehearing denied 326 U.S. 802, 66 S.Ct. 6, 90 L.Ed. 489; International Shoe Co. v. F. T. C., 1930, 280 U.S. 291, 298,

50 S.Ct. 89, 74 L.Ed. 431, it may be that they would not be involved if, for instance, the product provided by either party would be the same. However, we cannot say that it could not be in the public interest to have one newspaper rather than another. Where there is no identity of performance we will not say that the public does not have an interest in competition even though that competition be an elimination bout.

5. We agree with the court that the use of financial resources alone was not such an exercise of the Manchester "monopoly power" in Haverhill as would imply an intent by Union Leader wrongfully to exclude its competitor. Cf. United States v. Griffith, supra, 334 U.S. at pages 107–109, 68 S.Ct. at pages 945–946. By the same token Union Leader's criticism of NNE's financial strength is ill-founded.

6. It is true that after the Journal became a daily these practices were discontinued.

Leader contends that the court's ruling that this produced a group boycott (a per se violation of section 1, Klor's, Inc. v. Broadway-Hale Stores, Inc., 1959, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741), as distinguished from a mere appeal or attempt to create one, was without adequate findings, and that the only economic boycott possible was by advertisers and not the union [7] or Union Leader. This question is academic because, whether or not the advertisers responded with a boycott, we agree with the court's conclusion that Union Leader's part in the appeal demonstrated an intent to exclude competition unlawfully in violation of section 2.[8]

On December 8 the merchants met again with Loeb, and for some time three meetings were held each week. At the date of trial these meetings were being held weekly. The court found that there was a general understanding not only that the concerns which these merchants represented would not advertise in the Gazette, but that they would seek to induce others to advertise exclusively in the Journal. It further found that when the strike was settled the "interest" of these merchants slackened, and that Loeb thereafter paid each of them $50 a week (subsequently increased by promises, contingent upon the Journal becoming the only newspaper in Haverhill, of "massive" payments totaling $150,000 apiece over a period of years, plus an overriding bonus). The existence of these payments and promises were kept secret. Accordingly, it was not known to other advertisers and prospective advertisers, who thought the merchants were *bona fide* gratuitous endorsers of the Journal and opponents of the Gazette. The court held that this was a group boycott and, thus, a per se violation of section 1, and an unfair practice, not honestly industrial, and, thus, conclusive evidence of the exclusionary intent proving a violation of section 2.

We confess an inability to understand the basis of the Union Leader's appeal on this question.[9] See Klor's, Inc. v. Broadway-Hale Stores, Inc., supra; Lorain Journal Co. v. United States, 1951, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162.

Substantial competition immediately developed between the Journal and the

---

But it must have already become apparent that the Journal was in the union's picket line. Union Leader's present position may be illustrated by its argument that the shopper which was absorbing Gazette's advertising "was not in the same market with the Gazette." Almost as strained are its contentions based on testimony that it is economically justifiable to advertise in only one of two competing papers. This testimony fell far short of suggesting the reverse, that it was economically unjustifiable to advertise in both.

7. We expressly disclaim any approval of the court's citation of Allen Bradley Co. v. Local No. 3, International Brotherhood of Electrical Workers, 1945, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939, rehearing denied 326 U.S. 803, 66 S.Ct. 11, 90 L.Ed. 489. We are not required to decide whether the union violated the antitrust law, and so need not consider the very difficult problem of where labor's immunity to antitrust prosecution ceases.

8. The court expressly found that Union Leader did not come into Haverhill originally at the union's request. Therefore, it might be questionable whether the joint appearance of union and Union Leader representatives put any pressure on an advertiser to use only the Journal beyond that which already existed from the mere coincidental facts that the Gazette was being struck and the Journal provided alternative newspaper advertising on a roughly equivalent basis. But even if in fact it added no pressure, this would not undermine the court's finding that such pressure was wrongfully intended.

9. Union Leader describes these merchants as "honor-bound to support it," and states that it was "prudent * * * to engage outside help" and that obtaining "local advice * * * is so normal and much practiced in so many businesses that it has become a standard business technique." Seemingly, the contention is that the court's finding that Loeb was paying for something more than proper advice was plainly wrong. We have no inclination to agree.

Gazette with respect to advertising rates. The court found that the Journal resorted to "private concessions," that is to say, secret discriminatory rates. It held this to be an unfair practice evincing an exclusionary intent. In the light of other demonstrations of Union Leader's wrongful intent, no discussion of this finding is needed. Cf. United States v. Griffith, supra, 334 U.S. at page 109, 68 S.Ct. at page 946. This disposes of Union Leader's appeal from the judgment against it on the counterclaim. The balance of this opinion will deal with the complaint.

As a result of the strike and the Journal's competition, the Gazette incurred serious and continuous losses.[10] The settling of the strike by no means put an end to this, and by the fall of 1958 it found itself in danger of insolvency. It adopted various means to combat the Journal's competition. One of these was secret rate discrimination. Believing this indistinguishable from what it had held concerning Union Leader's similar discriminations, the court ruled [11] that this was a violation of section 2. The Gazette contended that its conduct was purely defensive, and was, at most, only evidence of a wrongful intent. The court rejected this claim, for a reason we believe to be unsound. After stating that price discrimination is "not to be excused because comparable practices were indulged in by plaintiff," it said,

> "Nor, on the ground that the motive was to retaliate or defend against ULC's illegal conduct, can the practice be regarded as merely a restraint of trade of doubtful validity rather than as an attempt to monopolize. This distinction is un-

acceptable because having about fifty per cent of the market, and knowing that the market would not permit two contestants to survive, Gazette's resort to any unfair practice, and its failure to confine itself to exercise of skill, foresight, and industry, compels a conclusion that Gazette had an exclusionary intent and had attempted to monopolize the market in violation of § 2 of the Sherman Act."

In calling this an "unfair practice" the court assumed the point. For, as we conceive the issue, the practice was "unfair" if conducted with an intent to monopolize, but it was fair if it was intended only to resist deterioration of its own position brought about by Union Leader's unlawful activities.

It is now clear that a plaintiff's own antitrust violations do not bar its successful maintenance of a private anti-trust action. Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 1951, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219, rehearing denied 340 U.S. 939, 71 S.Ct. 487, 95 L.Ed. 678; Moore v. Mead Service Co., 10 Cir., 1951, 190 F.2d 540, certiorari denied 342 U.S. 902, 72 S.Ct. 290, 96 L.Ed. 675.[12] Nor can the use of unfair methods by a competitor automatically justify adopting comparable unfair methods. F. T. C. v. A. E. Staley Mfg. Co., 1945, 324 U.S 746, 753, 65 S.Ct. 971, 89 L.Ed. 1338. However, it does not necessarily follow that a competitor's violations cannot constitute a circumstance to be considered in determining whether the defendant's conduct was in fact a violation. To the extent that a party has merely sought to offset the other's illegal acts it has not

---

10. The case comes before us after trial on all issues except damages. The court accordingly made no finding as to what portion of this loss would have resulted simply from the strike without the competition to which this opinion is addressed. We have no doubt that both contributed.

11. We have examined the court's opinion in the light of the conflicting analyses made by the parties and agree with Gazette that the word "compels" as used

by the court indicated a ruling of law and not a finding or conclusion of fact.

12. On remand for trial, *held*, for plaintiff, D.C.D.N.Mex. (unreported), reversed Mead's Fine Bread Co. v. Moore, 10 Cir., 1954, 208 F.2d 777, reversed and district court affirmed 1954, 348 U.S. 115, 75 S.Ct. 148, 99 L.Ed. 145, rehearing denied 348 U.S. 932, 75 S.Ct. 334, 99 L.Ed. 731.

acted with a wrongful intention, nor should its conduct result in public injury. In such a case there would be no reason to encourage recovery by the original offender, and every reason not to. In the Moore case, supra, Judge Phillips, specially concurring, stated that the defendant should be permitted to prove that its discriminatory price cutting was only intended to meet the unlawful boycott instituted by the plaintiff and so to retain its market position. 190 F.2d 540, 542.[13] The Supreme Court reflected the same reasoning in Times-Picayune Publishing Co. v. United States, 1953, 345 U.S. 594, 623, 73 S.Ct. 872, 888, 97 L.Ed. 1277, when it said, "[A]n unlawful trade practice may not be justified as an emulation of another's illegal plan. * * * But that factor is certainly relevant to illuminate ambiguous intent, particularly when planned injury to that other competitor is the crux of the charge." We do not think the fact that competition is in a natural monopoly climate can limit a defendant's right to defend itself. We have already pointed out that Union Leader was not restricted by this circumstance. What is sauce for the goose is sauce for the gander, and, while there may be two different flavors, the stock is the same. In the one situation we have recognized that entry into a monopoly market without more does not taint otherwise legal conduct; now we are saying that the existence of such a market cannot circumscribe conduct which might otherwise be justified as defensive. Essentially, we refuse to permit the inevitable monopoly to give either competitor a fortuitous advantage. However, contrary to this, the court ruled, in effect, that a company which resorts to unfair practices in its attempt to win a natural monopoly area

will be less open to repulse than one which enters a normal competitive field.

In his concurrence in the Moore case, Judge Phillips cautioned that to establish this defense a defendant must demonstrate that its prima facie violations [14] do not extend to a degree where they affirmatively indicate an attempt to create a monopoly. 190 F.2d at page 542. This does not mean that a defendant will be held to nice calculations as to just how much resistance is called for, cf. Brown v. United States, 1921, 256 U.S. 335, 343, 41 S.Ct. 501, 65 L.Ed. 961; United States v. Jasper, 4 Cir., 1955, 222 F.2d 632, 633; Dupre v. Maryland Management Corp., 1954, 283 App.Div. 701, 127 N.Y.S.2d 615; Klein v. John Stuart, Inc., Sup. 1954, 136 N.Y.S.2d 830, but nonetheless there may be a question of fact. In setting aside a decision in favor of Union Leader because of an erroneous ruling, we would normally remand to permit the court to determine this issue. However, we think it has been resolved by the subsidiary findings which the court has already made. In the course of ruling that this method of defending itself was foreclosed, the court stated that "in giving these discriminatory benefits, HG Co. was acting only after it had been put in peril of insolvency in the equity sense as a result of ULC's attempt to monopolize.[15] * * * Admittedly the provocation to retaliate was great, the total number of discriminations was not shown to be large, [and] the period of the discrimination was short * * * [180 F.Supp. 142]." We cannot read the opinion without concluding that but for its belief that it was precluded from doing so the court would have found in favor of Gazette. Indeed, we believe any other finding would have been clearly erroneous.[16]

13. Nothing in the subsequent history of the Moore case, see note 12 supra, suggests Supreme Court disapproval of this.

14. The case for Gazette here seems in some respects stronger than the one considered by Judge Phillips. There the defendant was called upon to justify conduct which the statute expressly prohibited. 15 U.S.C.A. § 13. In the present case the defendant merely has to rebut an inference of a wrongful intention drawn from particular actions.

15. Or, as Union Leader itself states in its brief with reference to this period, "Gazette's financial condition was such that it could not continue much longer."

16. The practical necessity of Gazette's adjusting rates in order to maintain its

■ One issue remains. Within a few months of establishing the Journal, Loeb commenced overtures looking to the purchase of the Gazette. By the fall of 1958 that paper was in such circumstances that its stockholders felt unable to continue. Not unnaturally, they were not eager to sell to Loeb. The Gazette was a member of a non-profit trade association whose members included about 80 of some 98 daily newspapers published throughout New England. Loeb was a former member. One of the purposes of the association was to give assistance (other than financial) to members in case of strikes. Many members were indignant with Loeb for taking advantage of and adding to the Gazette's difficulties, and considered his conduct both unethical and unlawful. At first some offered loans, but these were declined. When it was learned that the owners might have to sell, a number of the members jointly agreed to match Loeb's current offer. Their offer was accepted. As a result Newspapers of New England, Inc., was formed, and the Gazette stock was acquired in December 1958. NNE's principal shareholders were the local papers or individual publishers in Lowell, Lawrence, and Burlington, Vermont (in whose area Loeb published a competing paper), the balance being other small daily newspapers in various cities or the publishers of such. The court found that "every" shareholder acted in part because he believed that "the investment was commercially justified"; that "many" acted in part because they did not approve of Loeb's tactics; that "some" acted in part because they sympathized with the owners of the Gazette and feared that they "might at some time be victims of distress similar," and " 'if Loeb succeeded in Haverhill * * * then he * * * might * * * come into their territories.' " (Omissions are the court's.) The court added that there was "no basis for concluding that [a noninvestment] motive was primary in any shareholder's decision." [17] It further found that there was no commitment, "express or implied, * * * legal or * * * moral," that any shareholder would come to the aid of any other shareholder in the future if some similar occurrence threatened him. On the basis of this last finding it held that there was no combination or conspiracy to act other than in Haverhill. In addition, it held that there was no unlawful conduct in Haverhill itself. Examination of the record does not persuade us that the findings of fact are plainly wrong. However, we believe the legal issues are somewhat more complex than the court regarded them.

Union Leader's attack on NNE is in two parts, the first being the effect on competition in Haverhill, or what it terms the "narrow" market. As we noted at the beginning, section 7 of the Clayton Act,[18] as well as sections 1 and 2 of the Sherman Act, are involved here. Union

position is made plain by Loeb's own testimony. He stated that "this matter of the rates * * * goes to the very heart of any newspaper's survival." Elsewhere he testified that a serious consequence of secret discriminatory advertising practices—once it is known that they are indulged in—is that it enables an unscrupulous advertiser to play one paper against the other. A merchant who has not been offered a special rate-cut by one paper can nonetheless tell the other that he has been, and that other, knowing the first paper does do such things, fears to disbelieve him, and must match the price in order not to lose the customer.

17. It is not clear whether the purpose of this finding was to bring NNE within the investment exception of section 7, *infra* note 18, but we think the previously quoted finding would preclude this.

18. " * * * No corporation shall acquire, directly or indirectly, the whole or any part of the stock * * * of one or more corporations engaged in commerce, where in any line of commerce in any section of the country, the effect of such acquisition * * * may be substantially to lessen competition, or to tend to create a monopoly. This section shall not apply to corporations purchasing such stock solely for investment and not using the same by voting or otherwise to bring about, or in attempting to bring about, the substantial lessening of competition. * * * " 15 U.S.C.A. § 18.

Leader complains that it would have succeeded in purchasing the Gazette, or otherwise have successfully culminated its competition, but for NNE's appearance; that "the fact that the stockholders of the Gazette were forced to sell out establishes that the appellant possessed the * * * requisites for effective competition and victory," and that "a battle in which there are over thirty newspaper owners on one side against the appellant standing alone * * * hardly suggests a fair fight." However euphonious this melody, Union Leader's attempted treble does not harmonize with its base accompaniment. A party who pursues an unlawful course of conduct from the moment it appears on the scene is in a poor position to complain of an unfair fight. The more particularly is that so in this case in that NNE, apart from being there at all, was guilty of no unlawful competitive practices.

We readily agree with the district court with respect to the "narrow" market. Section 1 creates no impediment simply because NNE was comprised of a number of individual newspapers. Combinations are not unlawful per se. Union Leader's real objection is to the superior financial resources of the group. But we have never heard of a principle that a corporation having affluent shareholders could not compete. In reality, Union Leader is attempting to relight the *ignis fatuus* over competition in a monopoly area. If Union Leader could enter and was not prevented from using its funds acquired in a monopoly market, supplemented, as it developed, by outside loans, we see no reason why its potential rivals should be subject to greater restrictions. Nor does the fact that an acquisition was involved automatically lead to a section 7 violation. If competition is doomed by market conditions, it cannot be "lessened" by a change of ownership.

A different question arises under sections 2 and 7 with respect to the second part of Union Leader's complaint, regarding what it calls the "wider market." [19] It contends that any area in which individual papers who became shareholders of NNE are now doing business is a market of entry, and that the acquisition of Gazette's stock for the purpose of defeating Union Leader's Haverhill venture was for the purpose of protecting those areas from similar encroachments. An ounce of prevention is worth a pound of cure. See American Tobacco Co. v. United States, 1946, 328 U.S. 781, 797, 66 S.Ct. 1125, 90 L.Ed. 1575; cf. Gamco, Inc. v. Providence Fruit & Produce Bldg., Inc., 1 Cir., 1952, 194 F.2d 484, 488, certiorari denied 344 U.S. 817, 73 S.Ct. 11, 97 L.Ed. 636. We cannot agree with the district court that there could be no proscribed activity here because there was nothing but a number of narrow markets in each of which a shareholder was "king," and hence no "combined * * * market power." [180 F.Supp. at page 144.] Cf. United States v. Bethlehem Steel Corp., D.C.S.D. N.Y.1958, 168 F.Supp. 576, 600. On the contrary, in whatever measure any shareholder was concerned in protecting its own narrow market, it was aided by others similarly situated. To this degree we see a wider market and the possibility of an illegal transaction.

It is clear, as the court found, that some shareholders were interested in Loeb's getting his "comeuppance." The court's observation here that "the law allows other joys in business life beside making money," obviously must be limited to personal satisfactions less tangible than the elimination of competition. If one of NNE's motives was an intent to monopolize in the home areas of its stockholders, section 2 has been violated; or, if there was, as a probable result of teaching Loeb a lesson, a substantial depressant upon competition in such areas, section 7 has been violated. In either case NNE's purchase of the Gazette would have to be regarded as unlawful.

Giving fullest play to the evidence and the court's opinion, we cannot find that opposition to Loeb was anything more

19. We do not reconsider section 1 here as it falls if the others do.

than opposition to his methods. Union Leader produced no evidence that the shareholders feared competition as such, or had any reason to. As one witness put it, competition "is not economically possible, * * * the likelihood of anyone's trying to do it is remote." In twenty years only two newspapers had been started in New England. The one other than the Journal had failed immediately. We will not hold that a desire to prevent unlawful competition is evidence of an improper or monopolistic intent. Conversely, approaching the transaction from the standpoint of a potential competitor, we feel equally that there is no evidence of a tendency "substantially to lessen [lawful] competition" under section 7. The court dealt with the possible effect on any future competition by pointing out that there was no agreement between the shareholders, express or implied, that they would act again in any future situation. We agree with Union Leader that this is not determinative. Arguably, a potential competitor, though knowing that in Haverhill NNE was formed to meet an unfair competitor, might be dissuaded by a fear that mutual self-interest would bring into play the same kind of joint resistence no matter how lawfully he acted. But we cannot invent such a competitor and assume he would so think. Cf. United States v. Columbia Steel Co., 1948, 334 U.S. 495, 528, 68 S.Ct. 1107, 92 L.Ed. 1533, rehearing denied 334 U.S. 862, 68 S.Ct. 1525, 92 L. Ed. 1781. Union Leader must show a "reasonable probability" that an adverse effect on competition is "likely" to result. See United States v. E. I. du Pont de Nemours & Co., 1957, 353 U.S. 586, 589, 77 S.Ct. 872, 1 L.Ed.2d 1057. It has not shown even a reasonable possibility that competition is likely to exist, much less that such competition would be adversely affected. We cannot disagree with the court's conclusion that none of the component newspapers had appreciably increased its power to control prices and production as a result of participating in the NNE purchase of the Gazette. Consequently, we hold that the court did not err in rejecting Union Leader's contentions that NNE had violated sections 1, 2, and 7.

Judgment will be entered striking paragraphs 2, 6 and 8 from the partial final decree, as amended December 30, 1959, of the district court, and amending paragraph 10 thereof so that the phrase "paragraphs 6 and 7" therein shall read "paragraph 7," and otherwise affirming said decree.