293 F.2d 15
 SCOTT PUBLISHING CO., Inc., Appellant,
v.
COLUMBIA BASIN PUBLISHERS, INC.; Howard Parish and Associates, Inc.; Howard W. Parish; James M. Bryce; Kennewick-Pasco Typographical Union No. 831; Unitypo, Inc.; International Typographical Union; Woodruff Randolph; Don Hurd; Walter D. Marvick; Charles M. Lyon; Harold H. Clark; Joe Bailey; Francis E. McGlothlin; A. L. Wilie; Seattle Typographical Union No. 202; and Allied Printing Trades Council of Seattle, Appellees.
 No. 16871.
 United States Court of Appeals Ninth Circuit.
 June 30, 1961.
 Rehearing Denied August 28, 1961.
 
 Carl A. Jonson, Johnson, Jonson & Inslee, Seattle, Wash., Herbert W. Clark, Robert D. Raven, Howard M. Downs, Morrison, Foerster, Holloway, Shuman & Clark, San Francisco, Cal., for appellant.
 Joseph A. Barto, Lundin, Barto & Goucher, Seattle, Wash., for appellees Columbia Basin Publishers, Inc.
 Alfred J. Schweppe, Marion A. Marquis, Fredric C. Tausend, McMicken, Rupp & Schweppe, Seattle, Wash., for appellees Kennewick-Pasco et al.
 Sidney Dickstein, David I. Shapiro, Dickstein & Shapiro, Washington, D. C., for appellee International Typographical Union.
 Before HAMLEY, HAMLIN and MERRILL, Circuit Judges.
 HAMLIN, Circuit Judge.
 
 
 1
 Scott Publishing Co., Inc., appellant herein, in 1955 filed an action in the United States District Court for the Western District of Washington, Northern Division, against Columbia Basin Publishers, Inc., and others,[1] appellees herein, seeking damages under the provisions of 15 U.S.C.A. §§ 15 and 26,[2] by reason of certain alleged violations of the antitrust laws by appellees. After extensive pretrial procedures and the signing of a pretrial order, the action was tried before the court sitting without a jury. The trial judge rendered a judgment in favor of the appellees (defendants below), and appellant filed a timely appeal to this court from that judgment. Jurisdiction was in the district court by reason of 15 U.S.C.A. §§ 15 and 26, and jurisdiction is in this court under 28 U.S.C.A. §§ 1291 and 1294.
 
 
 2
 The opinion of the district court is reported as Scott Publishing Co. v. Columbia Basin Publishers et al., D.C.W.D. Wash.1959, 180 F.Supp. 754, and appellant, in the statement of the case contained in its brief, has set out portions of that opinion which it admits accurately portray the background of the controversy. The facts as set out below are taken in part from those portions of the opinion of the district court adopted by appellant as uncontroverted and also from other portions of the opinion of the district court as well as from the record.
 
 
 3
 Appellant corporation was organized in the State of Washington in September, 1947, and since November, 1947, has been engaged in the business of publishing the Tri-City Herald, a daily evening newspaper, at Kennewick, Washington, and distributing such newspaper through the tri-city area of the State of Washington.[3]
 
 
 4
 In the action brought by appellant, Columbia and its codefendants were charged with combining and conspiring together for the purpose of destroying and driving out of business the Tri-City Herald in order to create a monopoly for the Columbia Basin News in the daily newspaper business in that area in violation of the antitrust laws, specifically 15 U.S.C.A. §§ 1, 2, 13(a), and 14.[4]
 
 
 5
 The principal officers of appellant since its organization have been Glenn C. Lee, publisher of the Tri-City Herald, and Robert F. Philip, president of the corporation. Lee and Philip had no newspaper experience before 1947. In that year they learned that the Pasco Herald, a weekly newspaper with a job printing shop and office supply business, located in Pasco, Washington, within the tri-city area, was for sale. They associated themselves with one Hugh Scott, who had had some newspaper experience, formed Scott Publishing Company and purchased the Pasco Herald, agreeing to pay therefor a total of $80,000 plus inventory. Scott Publishing Company took possession of the property on October 1, 1947, and continued to publish the Pasco Herald as a weekly newspaper until November 13, 1947, when it began publication of a daily newspaper. At the beginning the Herald was published five days a week; but in January, 1949, a Sunday edition was added, and since that time the Herald has been published six days a week, Saturday being excluded.[5] While the Herald was a success almost from the beginning, appellant was not without problems. Additional trained personnel, additional newsprint, an expanded plant and larger press, a carrier organization, and additional working capital were needed. As time went on, some of these problems were solved, although by the spring of 1949 there was still need of additional working capital.
 
 
 6
 Some time prior to the spring of 1949, Howard Parish, one of the appellees, became acquainted with the tri-city area. He had spent most of his life in the newspaper business and had until 1946 been the publisher of a Seattle newspaper. Thereafter he had been an officer and stockholder of The Craftsman Press, a commercial printing company in Seattle. In his activities with the Craftsman Press, Parish had met Scott and Lee and had become familiar with the financial problems they were encountering in the operation of the Herald. He became interested in getting into the newspaper business in the tri-city area; and, after getting some financial backing in Seattle, he contacted Philip in May of 1949 to ask if the Tri-City Herald was for sale. A meeting was arranged between Lee, Philip and Parish at which Parish stated that he was only interested in purchasing a controlling interest in the paper or the entire property. Lee and Philip put a price of $410,000 on the entire company, but Parish was only willing to pay $250,000. Consequently no agreement was reached. In August of 1949 Parish, his son-in-law James M. Bryce, and some Seattle businessmen incorporated Columbia Basin Publishers, Inc., hereinafter called Columbia. This corporation commenced the publication of the Pasco News, a weekly newspaper, at Pasco. The publication was continued on a weekly basis until November, 1949, when the publication was changed to bi-weekly, and at that time the acquisition of the facilities necessary to publish a daily newspaper was commenced.
 
 
 7
 During the summer and fall of 1949 there was increased labor activity in the tri-city area. The typographical workers in that area had previously been under the jurisdiction of the typographical union at Walla Walla, Washington, some fifty miles away, but in August of 1949 the defendant Kennewick-Pasco Local 831 was chartered and affiliated with the International Typographical Union.[6] Scott at that time had no contract with the union. In December, 1949, Local 831 mailed notices to employers in the tri-city area asking the commencement of collective bargaining negotiations. These notices were sent to Scott, Columbia, Husk Printing Co., and Meverden Printing Co., the latter two being commercial job printing shops. Lee, on behalf of Scott, declined to join with the other employers in the area in meeting with the negotiating committee of Local 831. This was by reason of his personal animosity toward Parish who was attending the meetings. After several meetings between the committee of Local 831 and the representatives of three employers who did participate, a contract was agreed upon fixing a scale for members of the I.T.U. at $90 a week for 38¾ hours work. After this agreement had been reached Local 831 commenced separate negotiations with Scott. When no progress was made, Local 831 requested assistance from the I.T.U., and some special representatives of its president were sent into the area to participate in the negotiations.
 
 
 8
 Scott appealed to Pacific Northwest Newspaper Publishers Association for assistance in the negotiations, and the secretary of that association, one D. S. Haines, joined in the negotiations on behalf of Scott. These negotiations continued without agreement until March 3, 1950, when either a strike or a lockout ensued.[7] In anticipation of the fact that an agreement might not be reached, Scott had arranged to recruit non-union employees to produce the Herald under strike conditions. Teletypsetter equipment had been arranged for by the Publishers' Association, and this permitted the production of the paper with fewer skilled employees. When the strike or lockout occurred, publication of the Herald continued under non-union conditions.
 
 
 9
 In the period preceding the strike or lockout it was common knowledge in the tri-city area that a strike or lockout at the Herald plant would occur. Parish, Bryce and others in Columbia were aware of the possibility of labor trouble at the Herald. On March 14, 1950, eleven days after the strike or lockout at the Herald, Columbia, continuing with the plan that had been commenced earlier by the acquisition of sufficient plant facilities and personnel in November, 1949, commenced publication of the Columbia Basin News as a morning daily newspaper five days a week (later changed to six days a week).
 
 
 10
 No labor agreement has ever been reached between the Herald and the union. During this long period of time the difficulties between the Herald and the union have continued. As a part of the strike activities of Local 831 picket lines were established on the Herald premises, attempts were made to induce both readers and advertisers of the Herald to cease doing business with that paper. Merchants that advertised in the Herald were placed on "Do Not Patronize" lists which were distributed. Radio broadcasts were made, and other unions in the area were induced to discourage their members from patronizing the Herald. As the district court said: "in short all the traditional means of exerting pressure against an employer involved in a labor dispute with organized labor was engaged in."[8] During this same period of time competition between the Herald and the News for circulation, advertising, and general business had become increasingly keen.
 
 
 11
 In the publication of the News as a bi-weekly newspaper in competition with the established daily Herald, Columbia lost money, and when it changed to a daily publication Columbia was competing not only with the Herald but with the metropolitan morning newspapers circulated in the area. Columbia continued to lose money, and when one of the principal backers died in July, 1950, Parish attempted to get financial backing from another source. This source was Unitypo, Inc.
 
 
 12
 The evidence shows that Unitypo was formed as a corporation in 1946 by the International Typographical Union. The stock of Unitypo was held by members of the executive council of the I.T.U. in trust for the membership, and funds for the operation of Unitypo were supplied by the I.T.U. from its defense fund. The evidence showed that since its inception Unitypo has started newspapers in various cities in the United States and Canada where members of the I.T.U. have become engaged in a strike or a lockout with a monopoly publisher. It has also rendered encouragement and financial assistance to publishers considered friendly to labor and who were in competition with a newspaper considered unfair by the I.T.U. The activities of Unitypo in various places in assisting newspapers who were competing with so-called unfair newspapers were described in a report of one of its committees as the "development of a new and practical economic defensive weapon for economic pressure on unfair employers through permanent and effective competition."
 
 
 13
 Parish had heard of the activities of the I.T.U. and Unitypo, and when the losses of Columbia continued, he sought authority from the stockholders to seek a loan from Unitypo. This authorization was obtained on June 15, 1950, but it was not until after the death of one of the principal backers of Columbia in July, 1950, that Parish contacted Unitypo in Indianapolis, asking for financial assistance. A representative of Unitypo and of the I.T.U. was sent to Pasco to investigate. This representative, one Clarence R. Martin, who was an attorney for the I.T.U. and Unitypo, arranged for a $10,000 loan, which money was advanced to Columbia.[9]
 
 
 14
 The losses of Columbia continued and further loans were made or arranged by Unitypo from time to time. In one transaction the stock of Columbia was pledged to Unitypo as security. In 1954 Unitypo made a demand for payment. Subsequent to this demand the stock of Columbia which had been pledged as security was issued to Unitypo and Unitypo almost immediately transferred the stock to Parish and Bryce, who then redeposited the stock with Unitypo, endorsed in blank as security for the then outstanding loan. Also in 1952 Unitypo organized Howard Parish & Associates, Inc., a Washington corporation, and provided financing for this corporation sufficient to enable it to purchase and remodel a building which was leased and used as a plant and office by Columbia. The stock of Howard Parish & Associates, Inc., except for qualifying shares, was held by Unitypo. By December 31, 1958, the indebtedness of Columbia to Unitypo had reached $1,178,000. Up to this time the management of Columbia had been conducted by Parish. However, after December 31, 1958, Parish was replaced as manager of Columbia by one Edward Byrne, a former publisher of I.T.U. and Unitypo papers in Colorado and New York.
 
 
 15
 Appellant contends that there has been a violation by the appellees of Sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1 and 2, Section 2(a) of the Robinson-Patman Act, 15 U.S.C.A. § 13 (a), and Section 3 of the Clayton Act, 15 U.S.C.A. § 14.[10] The record consists of over 7,000 pages and there are over 900 exhibits. The district judge in his findings of fact and legal conclusions therefrom found against appellant on all four issues. Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A., provides that "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." As the Supreme Court stated in United States v. United States Gypsum Co., 1948, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746:
 
 
 16
 "A finding is clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."
 
 
 17
 It is with this principle in mind that we have examined the record.
 
 
 18
 Section 1 of the Sherman Act proscribes any "contract, combination. * * or conspiracy, in restraint of trade," and Section 2 makes criminal the action of any "person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any * * * trade or commerce * * *." There was in this as in most cases no direct evidence of any contract, combination or conspiracy in restraint of trade or of any attempt to monopolize any trade; and reliance was necessarily placed on circumstantial evidence to establish appellant's claims.
 
 
 19
 The district judge, while conceding that conflicting inferences could be drawn from some of the testimony, found that no violation of Section 1 or Section 2 had been proven. He found that "the intent and purpose of Unitypo, Inc., and I.T.U., in first assisting financially the Columbia Basin News and later taking over its publication, was simply to keep in operation in the Tri-City area a newspaper to compete with the Tri-City Herald, and was not to drive the Tri-City Herald out of business for the purpose of establishing a monopoly."[11] He further found "that the purpose and intent of Parish, Bryce and Columbia Basin Publishers, Inc., at all times was to establish a newspaper in competition with the Tri-City Herald, and that accepting whatever financial assistance Unitypo, Inc., or I.T.U. were willing to furnish is not inconsistent with that intent and purpose."[12]
 
 
 20
 There was ample testimony to support the findings of the district judge. Much of it is referred to in the court's opinion. There was testimony that on several occasions subsequent to 1950 and up to 1954 the union by letter communicated with Scott in an attempt to resume negotiations for a labor contract; and that if Scott had been willing to accept a union contract such as the News had with Local 831, Scott's troubles with the union would have been over. While Unitypo, Inc., over a period of years, advanced large sums of money to continue the publication of the Columbia Basin News, yet at no time was any offer made by Unitypo to furnish Parish or Bryce or the Columbia Basin News with funds to purchase the Herald, nor was there any evidence that at any time such a request had been made by either Parish, Bryce or Columbia Basin Publishers. If there had been any intent to monopolize, the Herald probably could have been purchased for a much lesser sum of money than was advanced over the years by Unitypo. Unitypo and the I.T.U., of course, wanted to do whatever they could in order to induce the Herald to operate under union conditions. To have two newspapers in the area operating under union conditions would of course provide more work for the members of the union. Both the union and the News management were happy to receive aid from the other in the struggle each was having against the Herald. For either side to have refused aid from the other side under the circumstances would have been highly unusual. The acceptance of such aid under the circumstances is not unlawful as long as there is no contract, combination or conspiracy to restrain trade and as long as there is no monopolizing or attempting to monopolize, or a conspiracy to monopolize.
 
 
 21
 There was no evidence that the demands made by the union when they negotiated with the Herald were unreasonable, nor was there any unreasonableness on the part of the union in insisting upon a written contract with the Herald. The court found that both Scott and the union negotiated in good faith but were unable to reach an agreement. The policy of Unitypo in continuing to advance money for the publication of the Columbia Basin News was in line with its national policy which it had followed in other places when there was a labor dispute with a publisher in competition with another newspaper which operated under union conditions. The difficulty that the News had in endeavoring to be a successful paper in the area, and the losses that it suffered in its efforts to succeed, are an indication of how firmly entrenched the Herald was.
 
 
 22
 Appellant relies upon remarks made by Parish before he established the News to the effect that he would buy the Herald out for five cents on the dollar and also on remarks later made by Parish, in letters written to Unitypo asking for more money to keep the News going, to the effect that they were "driving Lee and Scott Publishing Company to the wall" as showing an intent to drive the Herald out of business in order to create a monopoly. However, the court considered the circumstances under which those letters were written and held that they appeared to be "merely communications on the part of Parish and Bryce in the nature of a sales pitch to their financial angel in an effort to keep the money coming, and were no doubt received in that spirit by the I.T.U. and the Unitypo, Inc."[13] Referring to the statement made by Parish prior to the time that he bought the News about Philip and Lee "having to sell their newspaper to Parish at 5¢ on the dollar," the court felt that Parish actually believed that by reason of his superior experience in the newspaper field and his financial backing his paper would become the dominant paper in the tri-city area.
 
 
 23
 As further evidence of lack of proof of a conspiracy or an attempt to monopolize, it can be pointed out that within three months of the time of the strike at the Herald, Parish inserted an advertisement in a trade journal in an attempt to sell the Columbia Basin News. Later in that same year, there were efforts on the part of Parish and Bryce to interest Lee in the purchase of the Columbia Basin News. Lee had an appraisal made of the News plant, and thereafter there were further negotiations between Bryce and Lee for the sale of the News to Scott. These negotiations, however, resulted in no agreement for the asserted reason that Bryce insisted that as a condition of the sale the contract between the union and the Columbia Basin Publishers, Inc., would be honored.
 
 
 24
 The appellant also complains of the fact that on occasions the News sold advertising space for less than the price listed on its "rate cards"; that it published a free distribution weekly known as the Columbia Basin News Shopper; that it gave the largest advertiser in the area, C. C. Anderson Company, free advertising in the Shopper; and that it reduced the rates to local advertisers on national advertising.[14] Appellant's theory is that appellees used unfair competitive methods in order to gain a monopoly position in the tri-city area. We feel that the evidence does not support this contention.
 
 
 25
 The district court found that while the advertising rates originally set by the News were not always followed, these rates were "totally unrealistic" when the comparative circulation of the News and the Herald was considered, and that the rates charged were not "unreasonably low" compared to the advertising rates of the Herald with its larger circulation.[15] In March, 1951, the News revised its rate tags and thereafter "rates charged advertisers did not substantially deviate"[16] from the published rates. The evidence would indicate that the News had originally set the price that it would charge advertisers unrealistically high, and that there was a period of deviation from the published rates while management determined what price could be charged. In this connection it is well to remember that Parish and his associates probably grossly underestimated the strength of the Herald when they decided to move into the tri-city area, and it is easy to understand an initial period of instability while the paper attempted to adjust its policies to the realities of the situation.[17]
 
 
 26
 The court found that the publication of a free distribution paper, such as the Shopper, in an attempt to get complete area coverage is not an uncommon practice in the newspaper business. Concerning the free advertising given Anderson, the record shows that Anderson, the News' biggest advertiser, had advertised mostly on Fridays, resulting in an unbalanced paper. In consideration of Anderson's advertising in the News for a five-day period, Anderson was given free advertising in the Shopper. We see nothing wrong with this practice as it existed in this case. In any case the Herald was not harmed, for the evidence establishes that because of unfriendly feelings between the Anderson Company manager and Glenn Lee, publisher of the Herald, Anderson would not have placed any advertising in the Herald and would have advertised in any event in the News exclusively. It would appear from the record that the fact that the Herald did not get any advertising was due solely to the animosity between the two men and not to the business practices of the News.
 
 
 27
 In considering the action of the News during the period in question, the court found that "[a]lmost all of the devices, including the cooperative advertising practice, the publication of the Columbia Basin News Shopper, the giving of more favorable rates to larger advertisers, and the free distribution of newspapers, used by Columbia Basin News in this competitive struggle and of which plaintiff complains, were at one time or another throughout the period here in question used by the Tri-City Herald in this competitive struggle. In addition, Tri-City Herald used devices such as rebates to advertisers and payments of commissions to local advertising agencies on local display advertising to attract advertising, which were not used by Columbia Basin News."[18] The court considered the effect on the Herald of its long struggle with the union and with the News. At first the Herald lost both advertising and circulation revenue. When the strike started, the Herald's cost increased by virtue of the high wages and overtime paid to the imported non-union labor. However, as time went on and employees were trained, the costs were reduced and eventually became less than what they had been before the strike commenced. By September, 1950, wage cuts had been eliminated. During the following year raises were granted officers of the Herald and its financial condition has continued to improve.[19] The court found that "the Tri-City Herald at all times material has been and continues to be the dominant newspaper in the Tri-City area."[20] The appellant in its brief states "[T]he record in this case is uncontradicted that the tri-city area is capable of sustaining two newspapers."
 
 
 28
 Appellant contends that the evidence demanded a finding of conspiracy to drive the Herald out of business and of an attempt on the part of the News to create a monopoly. It wishes us to draw inferences from the testimony contrary to those drawn by the trial judge. The district judge had the opportunity to see and to hear all the many witnesses and to evaluate their testimony. After the lengthy trial the district judge in his opinion stated as follows:
 
 
 29
 "[T]he Court finds that the intent and purpose of Unitypo, Inc., and I.T.U., in first assisting financially the Columbia Basin News and later taking over its publication, was simply to keep in operation in the Tri-City area a newspaper to compete with the Tri-City Herald, and was not to drive the Tri-City Herald out of business for the purpose of establishing a monopoly. The Court further finds that the purpose and intent of Parish, Bryce and Columbia Basin Publishers, Inc., at all times was to establish a newspaper in competition with the Tri-City Herald, and that accepting whatever financial assistance Unitypo, Inc., or I.T.U. were willing to furnish is not inconsistent with that intent and purpose.[21]
 
 
 30
 * * * * * *
 
 
 31
 "In this case the evidence does not show either an actual restraint of trade or a monopoly, or the specific intent on the part of any of the defendants, either individually or in combination, to restrain trade or create a monopoly in the daily newspaper business in the Tri-City area."[22]
 
 
 32
 While it may be contended that if the district court had made other and different findings in reference to a conspiracy we might have been forced to uphold them, he, however, had the primary duty to draw the inferences and to make the findings; and we cannot say after a review of the extensive record that the findings of the district judge as to absence of violations of Sections 1 and 2 of the Sherman Act were clearly erroneous.
 
 
 33
 We now give our attention to the claimed violation of Section 2(a) of the Robinson-Patman Act, 15 U.S.C.A. § 13(a). The district court found that there were no price discriminations by Columbia Basin News in the sale of advertising which had the effect of lessening competition or which tended to create a monopoly or to injure, destroy or prevent competition. The appellant contends that the record shows that there were some price differences between rates charged by Columbia Basin News to one advertiser from those charged to other advertisers. This, however, in itself is not sufficient to show a violation of the Robinson-Patman Act.
 
 
 34
 In Balian Ice Cream Co. v. Arden Farms Co., 9 Cir., 1955, 231 F.2d 356, 367, this court said:
 
 
 35
 "It is also broadly stated in the argument that a differential in price in and of itself constitutes discrimination within the meaning of § 2(a) of the Clayton Act, as amended.
 
 
 36
 "But this postulate is universal, arrived at with insufficient bases. `Congress was dealing with competition, which it sought to protect, and monopoly, which it sought to prevent.' There is no presumption set up anywhere that, merely because there is a differential in various areas, necessarily a price discrimination exists." [Footnote omitted]
 
 
 37
 In F. T. C. v. Anheuser-Busch, Inc., 1960, 363 U.S. 536, 553, 80 S.Ct. 1267, 1277, 4 L.Ed.2d 1385, the Supreme Court said:
 
 
 38
 "What we have said makes it quite evident, we believe, that our decision does not raise the specter of a flat prohibition of price differentials, inasmuch as price differences constitute but one element of a § 2(a) violation."
 
 
 39
 The language of the Act provides that a discrimination in price is unlawful "where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce." The district court found against appellant and there is substantial evidence to justify the finding. As indicated above the evidence shows and the court found that the Herald has been at all times the dominant newspaper in the area. The News was a newcomer battling against the thoroughly established Herald. The Herald has significantly more linage than the News. The Herald circulation always exceeded that of the News. The circulation of the Herald did drop approximately 10% after the strike of March, 1950, but this is explained by reason of the labor difficulties of the Herald and by reason of the fact that there was a new daily newspaper in the area. Some loss of circulation continued during the remainder of 1950 and 1951, but by February of 1952 the circulation exceeded that of April, 1950 (the month following the strike), and it continued to grow thereafter until in June of 1959 the daily circulation was 15,413, and the Sunday circulation was over 16,000. An examination of the advertising in the Herald discloses a steady increase in linage. In an advertisement put out by the Herald in 1957, the statement was made that "The Tri-City Herald's Consistent Advertising Lead Continues to Widen the Gap In 1957." The chart advertised at that time showed that from 1951 to 1957 there had been a very substantial increase in the amount of advertising carried by the Herald and that from 1955 on to 1957 the advertising in the Columbia Basin News had gone steadily downward. In the same advertisement the statement was made that "The Tri-City Herald Leads in Total Advertising Lineage on better than a 2 to 1 margin over the second paper."[23] A comparison of the total advertising linage of the Herald and the News from 1951 through the first six months of 1959 shows the following figures:
 
 
 40
 Tri-City Herald Columbia Basin News

 1951 378,848 1951 185,681
 1952 418,172 1952 226,376
 1953 494,907 1953 305,812
 1954 535,998 1954 338,877
 1955 600,190 1955 343,317
 1956 514,869 1956 317,772
 1957 538,297 1957 310,418
 1958 527,712 1958 281,467
 1959 253,459 (First six 1959 128,799
 months)
 
 
 41
 From all the evidence it appears that the Herald grew demonstrably during the years in question. The language of the Court in Times-Picayune Publishing Co. v. United States, 1953, 345 U.S. 594, 621, 73 S.Ct. 872, 887, 97 L.Ed. 1277, is appropriate to the situation presented here:
 
 
 42
 "The Item, the alleged victim of the Times-Picayune Company's challenged trade practices, appeared, in short, to be doing well.
 
 
 43
 "The record in this case thus does not disclose evidence from which demonstrably deleterious effects on competition may be inferred."
 
 
 44
 Without discussing the details of the claimed price difference relied upon by appellant, we find that there was substantial evidence in the record to justify the finding of the district court that there were no price discriminations by Columbia Basin News in the sale of advertising which had the effect of lessening competition or which tended to create a monopoly or injure, destroy or prevent competition.[24]
 
 
 45
 The complaint also charged a violation of Section 3 of the Clayton Act, 15 U.S.C.A. § 14. The district court found that "[n]o advertising was sold in the Columbia Basin News or the Columbia Basin News Shopper, and no rates for advertising in either or both were fixed, upon any understanding or agreement that the advertiser would not advertise in the Tri-City Herald or any other advertising media in the area."[25] Appellants have not argued this violation in their brief, nor have they pointed to any evidence claimed to support the charge in the complaint. We shall therefore not discuss it.
 
 
 46
 We believe there was ample evidence in the record to support the district court's findings that there were no violations on the part of appellees of either Sections 1 and 2 of the Sherman Act, Section 2(a) of the Robinson-Patman Act, or Section 3 of the Clayton Act.
 
 
 47
 The judgment is affirmed.
 
 
 
 Notes:
 
 
 [1]
 Howard Parish and Associates, Inc.; Howard W. Parish; James M. Bryce; Kennewick-Pasco Typographical Union No. 831; Unitypo, Inc.; International Typographical Union; Woodruff Randolph; Don Hurd; Walter D. Marvick; Charles M. Lyon; Harold H. Clark; Joe Bailey; Francis E. McGlothlin; A. L. Wilie; Seattle Typographical Union No. 202; and Allied Printing Trades Council of Seattle
 
 
 [2]
 15 U.S.C.A. § 15. "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."
 15 U.S.C.A. § 26. "Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws * * * when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings * * *."
 
 
 [3]
 The tri-city area consists of the cities of Kennewick and Richland in Benton County, Washington, the city of Pasco in Franklin County, Washington, and the area surrounding these three cities
 
 
 [4]
 15 U.S.C.A. § 1, Sherman Act, § 1. "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal * * *."
 15 U.S.C.A. § 2, Sherman Act, § 2. "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor * * *."
 15 U.S.C.A. § 13(a), Robinson-Patman Act, § 2(a). "It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monoply in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them * * *."
 15 U.S.C.A. § 14, Clayton Act, § 3. "It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."
 
 
 [5]
 The name of the paper was changed from the "Pasco Herald" to the "Tri-City Herald" when daily publication commenced
 
 
 [6]
 The defendant International Typographical Union is a labor organization with its principal office at Indianapolis, Indiana. It has approximately 110,000 members in some 800 locals throughout the United States and Canada
 
 
 [7]
 Whether the rupture in relations between Scott and its employees was a strike or a lockout is not clear. However, which it was is immaterial to this case
 
 
 [8]
 180 F.Supp. at page 760
 
 
 [9]
 The loan was arranged in the following manner: The Seattle First National Bank agreed to lend $10,000 upon receipt of a note and chattel mortgage on Columbia's plant. This was immediately endorsed by the bank and assigned to Unitypo, which reimbursed the bank. The assignment to Unitypo was not recorded. The testimony showed that the reason for making the loan in this way was the prior experience of the I.T.U. and Unitypo of having the newspaper they sought to aid encounter advertisers' resistance when it became known that the paper was receiving union support
 
 
 [10]
 See footnote 4
 
 
 [11]
 180 F.Supp. at page 767
 
 
 [12]
 Ibid
 
 
 [13]
 Id., at page 766
 
 
 [14]
 In cooperative advertising, a national advertiser, either a manufacturer or distributor of a given product, will cooperate with a local retailer in local advertising. An advertisement will be inserted in a local newspaper advertising the product and the manufacturer or distributor will reimburse the local retailer who inserts the ad for a portion of the cost of the ad. In cooperative advertising Columbia Basin News would issue double bills, one bill to the local retail merchant at his contract rate, based on the number of inches of advertising that he used in the News, and this was the bill which the local advertiser would actually pay. Columbia Basin News issued a second bill to the local merchant to be submitted to the national advertiser for reimbursement at the open rate which in most instances would be higher than the local merchant's contract rate. In this way the local merchant would receive reimbursement for a higher proportion of the bill for the given ad than the national advertiser had agreed to pay
 
 
 [15]
 The circulation of the Herald at all times exceeded that of the News
 
 
 [16]
 180 F.Supp. at page 767
 
 
 [17]
 We do not feel that Union Leader Corp. v. Newspapers of New England, D.C.D. Mass.1960, 180 F.Supp. 125, modified 1 Cir., 1960, 284 F.2d 582, is applicable to the situation now before this court. In Union Leader the court was faced with an area that was capable of supporting only one daily newspaper; the evidence before us establishes that the tri-city area is capable of supporting two newspapers. The consistent unjustified deviation from published rates that was present in Union Leader is not present in this case. We feel that the factual situation in Union Leader so differs from the factual situation presented by this case that no benefit can be gained by torturing either until it fits the bed of the other. We are here dealing with inferences that could have been drawn from the facts that were presented to the trial judge, and the fact that Judge Wyzanski drew one set of inferences in the case before him does not mean that the evidence in this case does not support the inferences draw by Judge Murray
 
 
 [18]
 180 F.Supp. at page 768
 
 
 [19]
 Dividends on the stock of Scott were paid in 1953, 1954, 1956, 1957 and 1958. Salaries of officers were raised over the years and bonuses to officers were paid occasionally
 
 
 [20]
 180 F.Supp. at page 769
 
 
 [21]
 Id., at page 767
 
 
 [22]
 Id., at page 770
 
 
 [23]
 Another advertisement attached to the above mentioned statement reads as follows:
 "The FACTS!

LOOK AT THE HERALD'S ADVERTISING LEAD!
In the important TRI-CITY MARKET the HERALD PUBLISHES
69% of all AUTOMOTIVE DISPLAY
65% of all DRAPERIES and FLOOR COVERINGS
63% of all DRUG STORE DISPLAY
75% of all FURNITURE DISPLAY
69% of all HARDWARE and APPLIANCES
64% of all GROCERY DISPLAY
65% of all JEWELRY DISPLAY
73% of all LUMBER YARD DISPLAY
79% of all MEN'S WEAR DISPLAY
71% of all SHOE STORE DISPLAY
63% of all WOMEN'S WEAR DISPLAY
64% of all CLASSIFIED AUTOMOTIVE
64% of all REAL ESTATE — CLASSIFIED
64% of all LOCAL DISPLAY
70% of all NATIONAL DISPLAY
63% of all TOTAL ADVERTISING
82.4% COVERAGE OF ALL OCCUPIED DWELLINGS"
 
 
 [24]
 The claim is also made by appellee that advertising is not a commodity and does not come within the provisions of the Robinson-Patman Act. The district court did not reach this issue, and in view of our finding that the evidence supports the judgment of the district court, we do not feel it necessary to reach this issue either
 
 
 [25]
 180 F.Supp. at page 769